AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| United States of America<br>v.<br>Thomas G. Thompson<br><br>*Defendant(s)* | Case No. 2:13-mj-177 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __August 3, 2013__ in the county of __Franklin__ in the __Southern__ District of __Ohio__, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §401(3) | Criminal Contempt |

This criminal complaint is based on these facts:
See attched affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mark H. Stroh, Deputy U.S. Marshal
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 28, 2013

_____
*Judge's signature*

City and state: Columbus, Ohio

Elizabeth Preston Deavers, U.S. Magistrate Judge
*Printed name and title*

ATTACHMENT A
AFFIDAVIT

I, Mark Stroh, being duly sworn, depose and say:

1. I have been employed by the United States Marshal Service for over 20 years. I am currently assigned to find and investigate fugitives in addition to other duties. In that capacity I have received extensive training and have much experience regarding those topics and coordinate with other law enforcement officers regarding criminal contempt proceedings.

2. On July 18, 2012, District Judge Judge Edmund A. Sargus Jr., United States District Court for the Southern District of Ohio, issued a preliminary injunction against Thomas G. Thompson. Thompson is currently the defendant in both federal and state court for his expedition to uncover a steamer that had sunk in 1857 off the Carolina coast with 21 tons of gold in its hold. Thompson's company, Columbus Exploration, discovered the shipwrecked "SS Central America" in 1988 and brought up gold coins and bars worth up to $400 million. Many of the investors have brought suit because they have not been given any profits from the proceeds.

3. The Court ordered Thompson to file a declaration under oath specifying eight pieces of information regarding the location and number of the gold coins and funds in the civil case. Thompson did not comply with the order within the allotted ten-day period, but rather filed an extension request to submit that declaration later. The request was denied. The Court ordered that Thompson file the requested affidavit by Friday August 3, 2012. Contempt proceedings would be initiated if he failed to do so.

4. Thompson failed to comply with the order. The Court therefore preliminarily granted Plaintiffs' Motion to hold Thompson in Contempt. The Court ordered Thompson to appear at a hearing on August 13, 2012 where he would be given the opportunity to convince the court that he should not be held in contempt. The Court warned that if Thompson failed to appear at the hearing a warrant would be issued for his arrest.

5. On August 12, 2012, Attorney Shawn Organ was retained by Thompson through his administrative assistant, Alison Antekeier. Ms. Antekeier is believed to be Mr. Thompson's assistant, associate, and girlfriend. She has worked for Thompson since the conception of Columbus Exploration. Antekeier has hired all counsel acting on Thompson's behalf, and has done a number of other chores for Thompson.

6. On August 13, 2012, Mr. Organ entered his appearance at the show cause hearing. Mr. Thompson failed to appear at the hearing, and as a result the Court issued a bench warrant for Mr. Thompson's arrest.

7. On August 20, 2012, the Court filed an order that Mr. Thompson make Ms. Antekeier available within forty-eight (48) hours to be scheduled for a deposition by the Plaintiffs. Since August 12, 2012, Mr. Organ has had no further communication with Ms. Antekeier, and all efforts to contact her were unsuccessful.

8. It is verified that Antekeier has regular contact with Thompson. Antekeier was in telephonic contact, before, during, and after August 13, 2012 with the various attorneys that were hired on Thompson's behalf. Specifically, Antekeier spoke with at least one of the attorneys in the civil case after the warrant was issued for Thompson's arrest. Witness interviews confirm that Antekeier and Thompson have been together since the date of the hearing and the phone conversations.

9. On October 9, 2012, the U.S. Marshal Service learned that Thomas G. Thompson and Alison Antekeier were attempting to surreptitiously live in a house in Florida. The news media extensively covered both the underlying civil suit and the arrest warrant. The media coverage extended to major networks and media outlets both regionally and nationally. The breadth of the coverage caused James Kennedy, a handyman living in Florida, to recognize both Mr. Thompson and Ms. Antekeier.

10. Mr. Kennedy reported that he knew where Thompson and Antekeier had been living for the past six years. Mr. Kennedy reported this information to numerous sources, including the attorneys in the underlying civil case and the U.S. Marshal Service in Florida. It is documented that Thompson has lived with Antekeier at 1965 28th Avenue, Vero Beach, Florida 32960 for at least the past six years. It is presumed that they still maintain this residence to date.

11. After the warrant was issued on August 13, 2012, Kennedy went to the door of the home where Thompson and Antekeier were residing and confronted them regarding a delinquent rent payment. When he received no response, Kennedy told them he would call the police to have them removed. Neither Thompson nor Antekeier have been seen at the residence since this encounter, nor do they use the home as their fixed address. Thompson uses an address in south Florida that once belonged to his mother, but neither he nor his mother have been seen there in years. Antekeier also has no legitimate fixed address. Since 2007 she has used 2046 Treasure

Coast Plaza, Apt. 358, Vero Beach, FL 32960. Antekeier uses this address—which is a post office box at a Mailboxes Etc.—on official state of Florida documents and for filings in this Court.

12. In his capacity as the "handyman," Kennedy entered the multi-million dollar home that was abandoned by Thompson and Antekeier. Kennedy was not permitted to enter for weeks or even months and during that time period the house became decrepit. He reported that mold is growing throughout and things are strewn about the premises. Kennedy also discovered in Thompson's belongings a book entitled "How to Be Invisible," which discusses how to be a fugitive and what to do in order to disappear and not be located by law enforcement. There was a bookmark inside the book on a page that specifically stated "… use cash always and don't get bank accounts." The book also indicated that burying cash is a good way to secretly store it. Located throughout the residence were money straps that at one time each contained $10,000 in United States currency, as well as pipes that were used to make "pipe bombs." The cash was taken out of the straps and stuffed into the pipes, then both ends were threaded and the "bomb" was buried underground. When the rental company would receive payments for the residence the cash would be "sweaty." It is typical for money to become damp when buried underground.

13. For at least the past eight years, neither Thompson nor Antekeier have only used cash, and have not used their real names in any financial or business transactions. There also are no utilities in either one of their names; all bills are in the realtor's name and they pay in cash.

14. Mr. Kennedy also discovered tape recordings on microcassettes inside the residence. There are reportedly hundreds if not thousands of the microcassettes in clear plastic bags. The tapes are each labeled with their contents and names of Thompson's contacts. Kennedy played one of the microcassettes and uncovered a voicemail message stating emphatically that Thompson should call about all of the various hearings that were taking place in Federal and state court that he was not present for.

15. On the walls of the residence are a number of Post-It notes with the dates and times of depositions in the civil case in which Thompson is a defendant. It is not clear that they are all for hearings where Thompson's presence was required, but they pertained the underlying case. It appeared as if Thompson was tracking when the people who worked for him were summoned to Ohio to testify. Also located in the residence were bound binders of legal timelines that kept

close track of the different hearings. The notations said things such as "meeting of creditors 4/20/12; Friday at 11:00," and "conversion to Ch. 11 hearing 5/9/12; 2:00."

16. In the house were approximately twelve (12) cell phones that were all active. Thompson keeps his life very compartmentalized by using a different phone for a different purpose and contact. For instance, each attorney has a different phone, and all of his children call different phone numbers. Thompson does not leave the phones on, but rather lets the messages pile up for weeks. He then turns the phones on to collect the messages and record all the voicemails, then deletes the messages and shuts the cell phones off again.

17. On December 14, 2012, Mr. Organ filed a Motion to Withdraw as Counsel. Neither Mr. Thompson nor Ms. Antekeier responded to Mr. Organ's repeated attempts at communication during the course of the representation. In light of the complete inability to communicate with his client or Ms. Antekeier, Mr. Organ found it impossible for him to effectively perform his obligation of representing Mr. Thompson.

18. Numerous hearings took place between the plaintiffs' counsel and the defendants in the civil case. These proceedings revealed that the U.S. Marshal Service discovered the Florida residence. It became known that Mr. Thompson had not been seen at the residence in over two weeks, the renters were nearly three months behind in rent, and there had been no communication from the renters to the landlord. Plaintiffs' counsel proposed that the contents of the home be considered abandoned and sent to counsel so the property could be reviewed for value and sold.

19. Approximately twelve hours prior to a hearing before Judge Sargus was to determine whether to turn over all of the abandoned property of Thompson and Antekeier, a woman matching Antekeier's description arrived at the realtor's office and paid the rent for the residence in Vero Beach, FL. The woman arrived at the real estate office with a cash payment along with a note to the realtor which said "here is most of the back rent for now. We will pay more before 10/31/2012." The cash was described as "sweaty." Since this date, all rent payments for this residence have been made by attorney Carlton Willey, the personal attorney for Thomas G. Thompson. The real estate company is under the impression they will continue to be paid for the property.

20. The Court granted plaintiffs' counsel a chance to retrieve, safeguard, or otherwise secure items that may show what plaintiffs have alleged in their findings. The list was very minor and

included, but was not limited to: metal pipes used to store money in the ground; money straps stamped with $10,000, serial numbers, and dates on them; the book entitled "How to Be Invisible;" a bank statement in the name of "Harvey Thompson" (a known alias of Thomas Thompson) in the amount of $1,000,000; and numerous bags of microcassette tapes. These items, among others, were listed and identified by James Kennedy, the handyman for the house, through questioning during a deposition.

21. The Court directed defense counsel to go to Florida to gain entry to the house and retrieve the items so they would be available to the Court. The attorney, however, provided a mysterious explanation akin to "kids running through the million dollar mansion" and reported that the straps and the bank statement were no longer in the residence.

22. On September 12, 2008, Thompson was arrested by the Jacksonville, Florida Sheriff's Office. In his possession were what appeared to be state issued identification cards from three (3) different states using different names and identifiers but all bearing photographs which appear to be Thompson. Also located in an associated residence in Vero Beach, FL were documents, medications, and other items in these bearing the names names on the identification cards.

23. Based on all the facts and circumstances set forth in the preceding paragraphs of this affidavit, Affiant has probable cause to believe that Thomas G. Thompson disobeyed or resisted a lawful writ, process, order, rule, decree, or command of a court of the United States by failing to comply with the orders of Judge Edmund A. Sargus Jr, United States District Court for the Southern District of Ohio, a violation of 18 U.S.C. section 401(3).

_____
Mark Stroh
Deputy United States Marshal, United States Marshal Service

Sword and subscribed before me this 28th day of March, 2013

_____
ELIZABETH PRESTON DEAVERS
United States Magistrate Judge

5