UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,         )
                                  )
  PLAINTIFF,                      )         CASE NO. 2:15-CR-81
                                  )
       vs.                       )
                                  )
THOMAS G. THOMPSON,               )
                                  )
  DEFENDANT.                      )
_____)


TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS
BEFORE THE HONORABLE ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE
APRIL 14, 2023; 8:30 A.M.
COLUMBUS, OHIO


  APPEARANCES:

  FOR THE PLAINTIFF:
      KENNETH L. PARKER
      United States Attorney
      By:  Peter K. Glenn-Applegate
      Assistant United States Attorney
      303 Marconi Boulevard
      Columbus, Ohio  43215

  FOR THE DEFENDANT:
      Golden & Meizlish Co, LPA
      By:  Keith E. Golden, Esq.
      923 East Broad Street
      Columbus, Ohio  43205

  Thomas Thompson appearing via videoconference.

  FOR INTERESTED PARTY THE DISPATCH PRINTING COMPANY:
      Zeiger, Tigges & Little, LLP
      By:  Stuart G. Parsell, Esq.
      41 South High Street
      Columbus, Ohio  43215

APPEARANCES CONTINUED:

FOR INTERESTED PARTY JOHN PIDCOCK:
    McDonald Hopkins, LLC
    By:  Maria Carr, Esq.
    600 Superior Avenue, East, Suite 2100
    Cleveland, Ohio  44114

- - -

    Proceedings recorded by mechanical stenography, transcript produced by computer.

3

1        FRIDAY MORNING SESSION

2        APRIL 14, 2023

3                    – – –

4        THE COURT:  Good morning.

5        Ms. Stash, would you please call the first case.

6        THE DEPUTY CLERK:  Case No. 2:15-CR-81, United States

7    of America versus Thomas G. Thompson.

8        THE COURT:  Would counsel please identify themselves

9    for the record beginning with counsel for the government.

10       MR. GLENN-APPLEGATE:  Good morning, Your Honor.  Peter

11   Glenn-Applegate representing the United States.

12       THE COURT:  Good morning, Mr. Glenn-Applegate.

13   Counsel for the defense.

14       MR. GOLDEN:  Good morning, Your Honor.  Keith Golden

15   on behalf of Thomas Thompson.

16       THE COURT:  Good morning, Mr. Golden.  The record

17   should reflect that Mr. Thompson is appearing live.  He is not

18   in court, but he is appearing by video from the Milan,

19   Michigan, BOP facility.

20       Mr. Glenn-Applegate, would you provide us a background

21   with what brings us to this compliance hearing pursuant to Rule

22   53 of the Federal Rules of Criminal Procedure.

23       MR. GLENN-APPLEGATE:  Yes, Your Honor.

24       On December 16th, 2015, the Court entered an order

25   holding Mr. Thompson in civil contempt for failing to comply

1   with a prior court order.  In that order, the Court indicated

2   it would hold a series of status conferences to determine

3   whether Mr. Thompson will choose to bring himself into

4   compliance with the Court's order.  We are here today for one

5   of those periodic compliance hearings.

6           THE COURT:  I'll begin, Mr. Golden, by inquiring of

7   you as counsel for Mr. Thompson whether Mr. Thompson is

8   prepared to purge himself of his contempt by providing the

9   information that he was to provide pursuant to the terms of the

10  plea agreement and whether he has any evidence demonstrating

11  that either he cannot or will not come into compliance by

12  submitting to a debtor's examination in accordance with his

13  plea agreement.

14          MR. GOLDEN:  Thank you, Your Honor.

15          I just want to add one procedural thing.  I believe that

16  Mr. Thompson filed a pro se motion on December 8th of 2022,

17  titled Pro Se Motion of Defendant Thomas Thompson to Rescind

18  Contempt Order which I believe is still on the docket.  There's

19  no formal hearing for today, but I believe that ties into your

20  order of September.

21          THE COURT:  Mr. Golden, as you may or may not know,

22  the order -- that motion has yet to be resolved because in a

23  series of status conferences and court appearances,

24  Mr. Thompson has requested extensions of time and the like, and

25  continues to with respect to that motion because he had

5

1    anticipated retaining counsel.  The Court granted those motions

2    in the hopes that with appointed counsel -- appointed counsel

3    or -- either appointed or retained counsel, I'm sorry, would be

4    in a better position to marshal solid legal arguments in

5    support that you often don't find in pro se motions.  In other

6    words, you have the expertise and training to set forth

7    whatever legal arguments would support his motion to rescind

8    the contempt order.

9         Since we have grown accustomed to taking this in phases

10   or stages, if you will, Mr. Golden, the first matter would be

11   is Mr. Thompson prepared to purge himself of his contempt?

12        MR. GOLDEN:  Thank you.  The last time I was here

13   before you in this case was 2018.  Believe it or not, it's been

14   that long.  I've been actually involved with Mr. Thompson since

15   I first met him in 1976.  So I've been around this case quite a

16   bit.

17        Unfortunately, Your Honor, I do not bring good news to

18   you today.  I cannot do anything more than tell you it's more

19   of the same.  He's unable to purge.  You've heard this before.

20   This relates to the trust.  He has no idea where these subject

21   restruck coins are.  He does not have the ability to provide

22   that information.

23        My best guess at this point, they may be in the

24   possession of what is known as a protector, if one looks in the

25   trust.  We have no idea of that, and he's -- nothing has

6

1    changed.  I can't give you any evidence or testimony or

2    information relative to the purge order.

3          I don't believe, in all honesty, from what I've seen,

4    that anybody has attempted a judgment debtor exam of him since

5    the first one -- I'd say one and a half as opposed to two.

6          THE COURT:  The last time such exam took place -- I

7    don't remember exactly when it was, but I'm sure

8    Mr. Glenn-Applegate has it on his time line.  The last time an

9    attempt was made to have Mr. Thompson submit to a debtor's

10   examination, he declined to cooperate.

11         MR. GOLDEN:  That was the second one.  The first one,

12   I think, was -- 319 pages sticks out in my mind about the depo.

13   Then there was a proposal for a second one.  You are right.

14   That's the one he refused, through counsel, to sit for.

15         There was some declarant affidavits, I think, submitted

16   in lieu of that that weren't satisfactory.

17         THE COURT:  Under the terms of the plea agreement,

18   they were fairly clear.  He was to submit to a judgment

19   debtor's examination.  I don't think there was any ambiguity in

20   that language, and that's where we are.

21         Mr. Glenn-Applegate?

22         MR. GLENN-APPLEGATE:  I agree that the terms of the

23   plea agreement are clear and required him to sit for a debtor's

24   examination, and I also agree with the way the Court has

25   described what happened at the debtor's examination.

1          THE COURT:  You've answered the first part of the

2     Court's question.  I'm not going to belabor that because we

3     have some threshold matters that have to be met, and the

4     threshold matters have not yet been met.  Now that you have

5     been retained as counsel, at least, we can refocus on the

6     motion to rescind the contempt order.

7          Do you wish time to revise or modify the motion to

8     rescind the contempt order?  Or do you consider it now ripe now

9     that you've been retained and presumably have had an

10    opportunity to review it?  You can tell me whether that is

11    something you want to stand on or you want to revise.

12         MR. GOLDEN:  I wanted to finish one more thing quickly

13    that I didn't finish there.  I believe in addition to what I've

14    told you that I couldn't bring you any information today, I

15    would add one more thing, that I don't believe that further

16    incarceration would lead to that answer for you.

17         THE COURT:  That's the functional equivalent of an

18    oral motion to rescind the contempt order.  I don't want an

19    oral motion.  I want the motion in writing.

20         MR. GOLDEN:  In regards to your motion, based on your

21    motion -- I'm sorry, your order in September that brought us

22    here today for this -- in your review and the basis that's set

23    forth in there, that de novo review that you wanted to do today

24    in this hearing, I don't believe it's necessary to do anything

25    more with his motion.  I believe his motion dovetails into

8

1    yours and, in fact, just raises the medical issue that I wanted

2    to address today.

3          Aside from that, I don't think we need to do anything

4    with it.  It just essentially is just a formal request.  I

5    don't need to do anything more with it.  I'm satisfied as it

6    is.  I would like to present some evidence as we go a little

7    bit further.

8          THE COURT:  Mr. Glenn-Applegate, has the government

9    responded yet?

10         MR. GLENN-APPLEGATE:  Yes, Your Honor.  ECF document

11   262, we filed a response.

12         THE COURT:  Are there any other -- I'm going to allow

13   other counsel to identify themselves -- I apologize -- for the

14   record now at this time.

15         MS. CARR:  Thank you, Your Honor.  Maria Carr of

16   McDonald Hopkins on behalf of John Pidcock, trustee of the

17   Recovery Limited Partnership Trust.

18         THE COURT:  Who is with you at counsel table?

19         MR. PARSELL:  Thank you, Your Honor.  Stuart Parsell

20   with Zeiger, Tigges and Little on behalf of the Dispatch

21   Printing Company.

22         MR. GOLDEN:  I will add, though, that I did file under

23   seal Exhibits A, B, C and D.  That's in addition to the Ithaca

24   report that you have that I think is 254-2 under seal.  I would

25   attach those kind of to that motion.

9

1          THE COURT:  All right.  If there are no other

2   responses, then, I'm going to deem that motion ripe and

3   we'll -- based on your representations, Mr. Golden, we'll pivot

4   to deciding that motion.

5          Does counsel for Mr. Pidcock or counsel for the Dispatch

6   have any information with respect to the responses to the

7   defendant's motion to rescind the contempt order?

8          MS. CARR:  Your Honor, we don't have any formal

9   responses, but we would concur with the government's position.

10          THE COURT:  All right.

11          MR. PARSELL:  Thank you, Your Honor.  Yes.  On behalf

12   of the Dispatch, we also concur with the government's position.

13   We believe that continued incarceration does continue to serve

14   a coercive effect, and Mr. Thompson holds the keys to his own

15   jail cell.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          Mr. Golden, do you have anything further?

19          MR. GOLDEN:  No.  I would just like to present some

20   evidence, some testimony as we proceed, of Mr. Thompson

21   relative to the medical issues in support of the motion, the

22   medical side.  It also dovetails into what you're doing, the

23   continuing incarceration.  So at the appropriate time, I do

24   have a little bit of evidence.

25          THE COURT:  Could I see counsel at sidebar?

- - -

1

2        (The following proceeding was held at sidebar.)

3        THE COURT:  Mr. Glenn-Applegate, are you prepared to

4    respond to the defense evidence or to go forward with any

5    examination -- are you calling -- did you intend to call any

6    witnesses?

7        MR. GOLDEN:  Just Mr. Thompson to explain some things.

8        THE COURT:  And you're going to call him as a witness

9    to be cross-examined?

10       MR. GOLDEN:  He's got to testify under oath.  So I

11   would assume he gets a right to cross-examine him.

12       THE COURT:  Are you prepared to -- quite frankly,

13   Mr. Golden, because there were no motions, this was kind of a

14   status hearing.  I'm prepared to go forward if Mr. Thompson is

15   prepared to go forward and if the government is prepared to go

16   forward.  But I don't know what notice the government had, and

17   that's what I'm trying to figure out at this point.

18       MR. GOLDEN:  Can I tell you a little bit of what it's

19   going to be?

20       THE COURT:  Sure.

21       MR. GOLDEN:  It's essentially -- you've heard it all.

22   I just want to get some evidence in the record relative to what

23   the continued incarceration is -- the downsides to him

24   medically.  And it's essentially all the medical information

25   that's in there.  I'm going to stay away from medical.  I'm

11

1   going to cut him off if he starts talking medical.  But it's

2   more or less what's a day in the life, what's this

3   incarceration, this continued incarceration, and that dovetails

4   into your liberty interest question.  So that's essentially --

5   I don't know that --

6        THE COURT:  That makes sense in its own way.  But if

7   I'm going to have a hearing on his medical condition and the

8   conditions of his confinement, I want to have a hearing.  I

9   want to have a hearing in which both parties have notice, have

10  the ability to call witnesses and give me the information on

11  both sides that I would need to resolve this.

12       That's why -- I thought that you were going to tell me

13  today -- and I gave you every opportunity and you did answer

14  the question, but I thought that you were going to tell me that

15  you were going to modify his motion with legal argument.

16       MR. GOLDEN:  I don't think that's going to make a

17  difference in this particular instance.  I think all the legal

18  stuff is out there and it's quite clear what the issue is.  I

19  think it goes into that which you've raised in your order of

20  September.  I don't think I'm doing anything new.  I'm just

21  bringing you evidence relative to that.

22       MR. GLENN-APPLEGATE:  I think I have a two-part

23  response, Your Honor.  First, when it comes to the medical

24  things that Mr. Golden has filed, I'm no medical expert.  I

25  have not consulted with a medical expert.  So interpreting them

12

1    and interpreting the meaning of them is beyond me.  I'm not

2    prepared to talk about that today.  However, I think the

3    government's position on this is largely -- the medical piece

4    is largely irrelevant to our response to this.  I think that --

5    I don't mean it's irrelevant to the Court's consideration.

6                THE COURT:  I understand.

7                MR. GLENN-APPLEGATE:  Our position, I think, is not

8    going to vary too much if I consult an expert.  So I think I

9    could be prepared to go forward today.

10               MR. GOLDEN:  I'm not going into any medical stuff.  I

11   mean, the technical side where I need an expert.  You can cut

12   me off if he starts to talk about expert -- I've warned him I

13   don't want to talk about the medical side, as much as what's

14   your day like, what's your life like.

15               THE COURT:  All right.  Be that the case, then, we

16   will proceed.

17               MR. GOLDEN:  Can I ask you one question?  I'm a little

18   concerned when we start talking about some of this stuff about

19   HIPAA concerns and getting some of this stuff out in the

20   courtroom.  I'm not talking about medical diagnosis and what's

21   the results and stuff like that, but just this general thing.

22   It's a little concern that I have.

23               THE COURT:  I understand your concern and the basis of

24   it.  But as the interrogator, you're the master of your

25   questions.  The only problem is, you don't know at all times

13

1    how your witness might respond.  So we're all in the same boat

2    in that respect.

3        (The following proceeding was held in open court.)

4        THE COURT:  At this time, Mr. Golden, are you prepared

5    to proceed with your examination of Mr. Thompson?

6        MR. GOLDEN:  Yes, Your Honor.

7        THE COURT:  What I'm going to do is I'm going to have

8    you examine Mr. Thompson from the podium, and then

9    Mr. Glenn-Applegate can conduct his cross-examination from the

10   podium when you're done.

11       MR. GOLDEN:  The only concern that I have is that some

12   of the information I'm going to elicit may be a little bit

13   premature relative to the comments and what the issues are that

14   are on the table today.  So I just want you to keep that in

15   mind, too, that I will tie it together and bring it into the

16   connection with your order of September once it's done and I

17   get the opportunity to give my summary or my argument.

18       THE COURT:  I think I understand.  But as I indicated

19   at sidebar, you are the master of your examination as the

20   interrogator.  So I know given your vast experience,

21   Mr. Golden, that you will keep the questions and the subject

22   matter to the issues germane to that September order.  Thank

23   you.

24       Ms. Stash, would you please swear in Mr. Thompson.

25       (Witness sworn.)

14

1      THE COURT:  Please proceed.

2      MR. GOLDEN:  Thank you.

3                  - - -

4              THOMAS THOMPSON

5   Called as a witness on behalf of the Defendant, being first

6   duly sworn, testified as follows:

7              DIRECT EXAMINATION

8   BY MR. GOLDEN:

9   Q.   Mr. Thompson, please state your name.

10  A.   Thomas G. Thompson.

11  Q.   How long have you been incarcerated?

12  A.   I think since January 2015.

13  Q.   Okay.  And was that when you were arrested in Florida?

14  A.   Yes.

15  Q.   Then you've been incarcerated on this contempt order

16  since -- do you remember when that was?

17  A.   Not exactly.  Maybe a half a year, a year -- they took

18  me off my protocol at that point, and so my remembrance is

19  quite fuzzy.

20  Q.   Okay.  Would 76 months sound about right to you that

21  you've been in jail on this contempt order now?

22  A.   Yes, that is about right.

23  Q.   During that period of time, have you been in Milan

24  and -- what? -- were you in Delaware County before that?

25  A.   Yes.

15

1    Q.    I'd like you to tell the Court.  You filed a motion on

2    December 8th of last year asking the Court to rescind the

3    existing contempt order, and you listed in there a number of

4    reasons, correct?

5    A.    Yes.

6    Q.    All right.  One of the reasons had to do with the

7    medical condition that you're experiencing?

8    A.    Yes.

9    Q.    Okay.  Since I have so much trouble saying what it is,

10   would you pronounce what it is?

11   A.    Well, the underlying disease I have is called myalgic

12   encephalomyelitis.  From Latin, myalgic means things like

13   muscle pain.  Encephalomyelitis has to do with brain

14   inflammation and brain stem inflammation which affects your

15   autonomic systems and throws a number of things out of kilter.

16   Q.    Do you remember how long has this been present that

17   you've been dealing with this?  How far back does this go?

18   A.    1993.

19   Q.    Have people believed this when you tell them this since

20   then over all of these years?  Does anybody believe you?

21   A.    I work with 800 other scientists.  I went to the top

22   people in the country with regard to this.

23   Q.    Not those people.  I'm saying people here in the court

24   system or judicial system.  Do people believe you when you tell

25   them that?

16

1    A.    No.   People don't believe it because it's a new paradigm

2    of disease.   For instance --

3    Q.    We want to keep our questions brief for the moment, the

4    answers.

5          Now, as a consequence of this, I want to go over a few

6    areas with you.   First of all, what types of accommodations do

7    you have to make for yourself during the course of the day as a

8    consequence of being incarcerated with this disease?   What do

9    you have to do?   Describe to the Court your day and what you

10   have to deal with.

11   A.    Well, it's quite difficult because it's -- it's an

12   exertional disease.   They call it an exertional disease.   In

13   other words, it's an intracellular disease where your cells do

14   not have enough energy.   They bounce along the bottom of just

15   enough energy to stay alive.   When you exert, whether it's

16   physical like using your muscles, or whether it's cognitive,

17   your brain, or if you get emotionally upset, then a day to

18   three days later, you get extremely ill.

19   Q.    Let's turn this into what does this mean for you every

20   day?   Describe to me what you have to do, as you indicated, to

21   stay alive or function as a consequence of this while you're

22   incarcerated.

23   A.    Well, one of the things that's obvious is that I react

24   wildly to ventilation systems.   And so I have to stay in my

25   room on average it's about 22 hours a day.   And some days,

17

1  I'm -- I can't come out at all for many days.

2  Q.   What is it that's outside of your cell that you have to

3  stay away from?  What's the problem?

4  A.   Well, it's a chemical hypersensitivity.  There's seven

5  things we know of with me.  For instance, in here on the

6  ceiling, there's flame retardant, and that's one of the major

7  things.  When the ventilation system comes on, it stirs up that

8  flame retardant and then that gets into my clothes, any kind of

9  woven fabrics, and that holds it on my skin.  I react to that

10 through a number of things.  Probably the biggest thing is the

11 lack of inability to sleep because it amps up my immune system.

12 My immune system is on high alert all the time.

13      It's like having -- autoimmune system for all the cells

14 in your body.  It's like having all of your cells -- in other

15 words, the immune system starts to attack all the cells in your

16 body.  It's a very painful experience.  Your joints hurt.  Your

17 muscles hurt.  It doesn't have to be in the same joint.  It can

18 be in your knees.  It can be in your hips.

19 Q.   You just said "your" meaning me.  How about you?  Does

20 it do it to you?

21 A.   I'm sorry.  Yeah.  That's exactly what it does to me

22 here.

23 Q.   What about sleep?  You started to mention the sleep.  Do

24 you sleep through the night?

25 A.   No.

18

1    Q.    How much sleep do you get?

2    A.    Since the December before last, I've only gotten -- this

3    is -- I've only gotten two-and-a-half hours sleep.

4    Q.    Would you say over time this has gotten worse?

5    A.    Yes.

6    Q.    What about your activities?  What do you do?  What can

7    you do during the day as a consequence?

8    A.    Well, I can't do very much at all.  I mean, I can do --

9    I can exert -- muscle-wise, I can exert myself for 30 seconds.

10   I can do that every six hours or twice a day without getting

11   seriously ill in a day or three days.

12         This is hard to believe -- just like you were talking

13   about.  This is really hard for people to believe because most

14   diseases you want to exercise your way out of them.  This is

15   just the opposite of that.  It's hard to understand.  Doctors

16   are -- my doctor in Florida trains people, trains doctors on

17   how not to harm people that have this disease.

18   Q.    What about your -- so are there things that you do

19   around -- that you do when you get out of your cell that they

20   have you do or activities that are scheduled for you?  Are you

21   able to do those?

22   A.    No, I'm not.  And it's horrible because if they give you

23   a direct order to do something and you don't do the direct

24   order, then they can send you to the hole.  Now, the hole was

25   built in 1933.

19

1    Q.   Who is "they"?  When you say "they," who are you

2  referring to?

3    A.   Like a commanding officer, one of the officers here.

4  They tell you everything to do.  And so, fortunately, here they

5  are -- they have been helpful to me because just about every

6  rule here I have to violate in order to survive, in other

7  words, to thrive at all.  And the real danger is if we get a

8  new officer in here who doesn't understand what we're doing

9  because it's different.  It's different than the way normal

10  things operate.  I mean, I have to do things like pack my door

11  when the ventilation comes on.  I have to have it locked.  I

12  can't pack it unless the door is locked.

13    Q.   What do you pack it with?

14    A.   Toilet paper.

15    Q.   I'm just envisioning -- around the door?  Under the

16  door?

17    A.   I roll up a towel so it's about three quarters of an

18  inch thick and use my fork to put that under the door and then

19  roll up toilet paper and put it around the outside.  It's about

20  a quarter-inch gap in the door.

21    Q.   So what about -- I assume you don't have a window that

22  you can open in your cell.  So you don't have to deal with

23  that?

24    A.   No.

25    Q.   Okay.  What about your thinking, your brain?  We're

20

1  talking now a little bit about your physical.  What about

2  mentally?  What's going on with you mentally as a consequence

3  of the disease and being incarcerated at this length of time?

4  A.  Well, the major thing is when your immune system is

5  amped up which is all the time in here, your brain operates --

6  if you've ever had the flu really bad and you're trying to

7  sleep in the middle of the night and you're fatigued, you can't

8  sleep.  It's a feeling like that.  You also can't think very

9  well.  You can watch TV and not even understand what's going

10  on.

11  Q.  Again, you're saying "your."  I want to hear about "my."

12  Are you talking about what you're experiencing or what people

13  generally should experience?

14  A.  I was trying to make an analogy so everybody could

15  understand.

16  Q.  Just tell us about you.

17  A.  It's like having the flu all the time.  It's like having

18  serious flu all the time except you have all these other side

19  effects, like you have joint aches.  It can attack any one of

20  the cells in your body that is lower in energy reserves than

21  other cells.  So if your liver or your pancreas or your heart,

22  your brain, any of those things get lower than the rest of

23  them, then those are the organs and the tissue that will not

24  function properly.

25  Q.  What impact does this have on your memory?  What's been

21

1    going on with your memory?

2    A.    The impact on the memory is you get extremely -- you get

3    like you get extreme ADA, extreme attention deficit disorder I

4    think they call it, and very bad short-term memory.

5    Q.    Is that what you're experiencing?

6    A.    Yes.

7    Q.    How do you think it's impacted on your ability to

8    cooperate and assist me?  Has it had any impact on your ability

9    to cooperate and assist me in preparing for this hearing?

10   A.    As you know, it's been horrible.  It's hard for me to

11   stay on track.  If I start talking about any topic, I could

12   drift off into some minor part of that topic.

13   Q.    Would that be a good explanation of some of your

14   interactions with the Court in the past?  Would you attribute

15   some of that to the same issue?

16        THE COURT:  I'm going to ask to you rephrase that,

17   Mr. Golden.  I've allowed you to do a modicum of leading which

18   I typically don't because Mr. Thompson is a sophisticated

19   scientist.  He understands the language, and he understands how

20   to answer value-neutral questions.  So I'm going to ask you to

21   pose them.

22   BY MR. GOLDEN:

23   Q.    What about your diet?  Are there any issues with your

24   diet and any issues with your disease relative to the diet that

25   you have, the food they feed you there in the prison?

22

1    A.   Yes, of course.  You can see on the first few pages of

2    my medical record when they first brought me into the county

3    jail down in Florida and I said what I had, they -- myalgic

4    encephalomyelitis, the doctor there knew right away that I

5    would have arterial problems and heart problems and brain

6    problems and organ problems.  That's where all your arteries

7    and capillaries are.  It's in my record.

8         I had already gone -- for the same purpose, I had

9    already gone to a doctor who specializes in reducing and

10   reversing any kind of atherosclerosis in your arteries and

11   capillaries.

12   Q.   Does that have an impact on what you're supposed to eat?

13   A.   The real basic part of the way to reverse it, stabilize

14   atherosclerosis, is eat 20 grams of fat per day.  Here,

15   everything is swimming in fat.  It's well over a hundred grams

16   of fat a day.

17   Q.   Have you made any requests for accommodations in your

18   diet there at the prison?

19   A.   Yes, I have.  I really liked the doctor who was here

20   before.  He resigned because he got COVID and left.

21   Q.   You've made the request.  Have they made a special diet

22   for you?  Or do you eat what everybody else eats?

23   A.   No.  He had and they still don't have -- there's no

24   relationship between the medical side and the food service

25   side.

23

1    Q.    How about you?  Have you been able to ask --

2    A.    No, I have not.  The inmates actually provide the food

3    for me.  I have to mix and match stuff in a way.  It's very

4    difficult to do to get 20 -- down to 20 grams a day.  I can't

5    do it very often.

6    Q.    Okay.  Do you just not eat?  How do you get by, then?

7    A.    Well, I eat mostly cereal.  That helps because cereal

8    has almost no fat in it.

9    Q.    How about all the sugar?

10   A.    It's hard to get protein because all the protein is like

11   all the meats and stuff.  The way they're cooked, it just has a

12   lot of fat in it.  The inmates have done a lot to try to get

13   food to me and do things to help.  It's difficult.

14   Q.    When you were arrested in Florida, if I recall, there

15   was quite a bit of information that came out about -- I think

16   in either the hotel you were in or the house you had been

17   living in before, things that were -- fans were covered, and

18   windows.  There were all kinds of things that were done to the

19   facility that would seem kind of unusual to the average person.

20   Was what you had done then consistent with what you have been

21   doing in the prison?

22   A.    Yeah, it's the same sort of thing.  The chemical

23   hypersensitivity started mostly in 1998.  I got the base

24   disease in '93, and I started getting -- reacting to all kinds

25   of things like phenolic resin, the fiberglass powder, like I

24

1    said, seven things.

2    Q.   Let's move on now to -- you've briefly given a good idea

3    about what you have to do and what you're experiencing.  What

4    about the treatment by the medical staff there?  Have they been

5    able to deal appropriately with the issues that you have

6    arising out of this disease?

7    A.   Well, I mean, they're trying.  They're just not at all

8    capable of dealing with it.  And it's a different paradigm.  So

9    a lot of their normal instincts are backwards.  There's only

10   something like 25 specialists in the country.  That's one per

11   two states.  There's almost none.  The network for this is from

12   LA to Miami to New York.  It's the same technologies that were

13   developed to defeat the AIDS problem worldwide.

14   Q.   I think you filed in the past various motions asking for

15   the Court to assist you in being brought outside of the

16   facility to get various evaluations and treatment.  Has that

17   been everything -- has the Court been able to provide to you

18   everything that has been necessary for you?

19   A.   They have been helpful.  And it's just very difficult in

20   this kind of facility or any kind of facility.  You have to

21   travel different places.  The nearest place to do -- is really

22   on the East Coast and West Coast.  There's really only two main

23   places that do one of the key tests for the disease.  Then you

24   get into a whole other problem when you get into the treatment

25   because the treatment has to do with -- it's the same way they

25

1    treated Magic Johnson to keep him from getting AIDS back in

2    '91.  My doctor and his colleague figured out there was only 1

3    percent of the people -- even though they had HIV, the virus,

4    they did not get AIDS, the syndrome.

5            THE COURT:  Mr. Golden, while you have him on

6    direct -- because one of the things that's sort of implicit in

7    your line of questioning is that he has been diagnosed by some

8    health care professional other than himself with this myalgic

9    encephalomyelitis.  As you recall from your previous

10   involvement in the case and I'm sure from reading the file, we

11   have had independent medical examinations performed on

12   Mr. Thompson.  I don't know that anyone, other than

13   Mr. Thompson, has submitted a report diagnosing myalgic

14   encephalomyelitis.

15       Since your argument and the evidence seem to be premised

16   on him having this and not having access to treatment for this

17   condition, at least we probably should have some evidence on

18   record as to the basis of this diagnosis.

19           THE WITNESS:  I can provide that.  I'm pretty sure

20   there's affidavits before you, Your Honor, from my doctor in

21   Florida who is a medical research doctor that attests to the

22   fact that I have this disease.

23   BY MR. GOLDEN:

24   Q.   Okay.  Most of the stuff we're talking about was filed

25   at some point in the case under seal?

26

1    A.   Yes.

2    Q.   Okay.

3    A.   I'm not sure.

4    Q.   I believe the Ithaca evaluation that was conducted?

5    A.   Yes.

6    Q.   Okay.  To your recollection, are you satisfied that that

7   amply diagnoses your condition and identifies that which we're

8   talking about?

9    A.   If you combine that -- that's a more recent test.  It

10  talks primarily about my deficits and the problems I have, like

11  I can only function, at most, a couple hours a day.  I can't --

12  whether -- and that's just brain-wise.  It's even hard for me

13  to sit up for very long because I have -- my blood pressure

14  fluctuates.  It's one of the autonomic systems that doesn't

15  work very well.  You want to be prone a lot of times.  It

16  points out a number of those issues.  But that combined also

17  with the affidavits from my doctor in Florida who is a highly

18  regarded -- he went to George Washington University, highly

19  regarded doctor in the field.

20    Q.   There were some tests done as well.  The Court ordered

21  the two-day stress test?

22    A.   Yes.  Two-day cardiopulmonary test, yes.

23    Q.   And that was conducted when?

24    A.   I have trouble with time.  My brain stores things in

25  different places.  Like almost a year ago.

27

1    Q.   Do you believe that those adequately reflected the

2    conditions present with ME?

3    A.   Yes.

4    Q.   Okay.  Let me ask you about a couple other things.

5    You're in a wheelchair, correct?

6    A.   Yes.

7    Q.   What's the status of the wheelchair and what the staff

8    does?  What's going on with the wheelchair?

9    A.   Well, I mean, they've been very helpful in one way, but

10   every time there's somebody new on board, they don't understand

11   that you have to have a wheelchair with this disease because

12   you need to be able to measure how much exertion you have

13   during the day.  You can't just be standing around in a phone

14   line or something.

15   Q.   Don't talk about me.  Talk about you.

16   A.   All right.  So it's different.  Most diseases -- like

17   you're in the hospital, you've been in a huge car wreak, and,

18   as soon as you're able, they want you to try to walk down the

19   hall and come back.  This disease is just the opposite.

20   Q.   Do they want you to do that in the facility?

21   A.   They try to get me to do that.  Some people do.  Some

22   people are helpful, and some people have taken some time and

23   done some research about the disease and are helpful.  You get

24   somebody new on board and it's terrible because they can tell

25   to you do whatever they want, and if you don't follow what they

28

1    say -- they say scrub the floor, and if you don't do that, it

2    could be life threatening.  I'm living in terror all the time

3    here because things are happening all the time that can be life

4    threatening.

5    Q.   All right.  Let me ask you this.

6    A.   Maiming is bad enough.

7    Q.   Would you say that your incarceration has an impact on

8    your symptoms?

9    A.   Yeah.  It has -- it definitely does.

10    Q.   What is that?

11    A.   Well, all of the symptoms are -- I call it extreme

12    jetlag is the symptoms.  When you get extreme jetlag which is

13    worse than any jetlag you've ever felt before, all your body

14    systems, all your hormones -- it's called a neuroimmune system

15    disease.  But your brain, your neurons -- your brain and your

16    immune system are not coordinated together well.  That results

17    in your endocrine system, all your hormones and everything act

18    up so you get cramps all over your body.

19    Q.   You.  Not me.  Are you experiencing --

20    A.   Yeah.  I get cramps all over and they can be in

21    different places.  You can get cramps in your back and in your

22    legs.  Then you get joint problems.  You think your joints are

23    highly painful, and all of a sudden that isn't that joint

24    anymore, it's your hip joints or your back joints, your

25    shoulders.

29

1    Q.    So compare where you are today and what you're

2   experiencing to what you were experiencing 76 months ago.  Is

3   it worse now than it was back then?

4    A.    Oh, yeah.

5    Q.    Is it getting worse as we go day by day?

6    A.    It's progressing if you're not treating it.  There is a

7   protocol that was developed for me that stops the disease.

8   Still can't get the protocol.

9    Q.    Are they following that protocol?  Have they adopted

10  that protocol there in the system?

11   A.    Not at all.  No, they're at risk here of being sued

12  because if they diagnose me here, then they can't go to court

13  and say, hey, we didn't know what he had.  I'm not saying this

14  place is bad.  Hospitals work the same way.  They have to be

15  careful because of malpractice litigation.  A lot of times they

16  try not -- there's people with hep C in here.  They try not to

17  diagnose them.

18   Q.    Going forward, going forward -- I know it's in the

19  materials that we provided to the judge.  What do you perceive

20  personally if you continue in this prison as we are now?

21  What's in store for you and the impact on your disease?

22   A.    Well, it's a progressive problem.  Things -- more and

23  more things don't work properly and more and more things are

24  out of regulation, and it just gets worse and worse.  And the

25  more things that are out of line, the more things like your

30

1   liver doesn't work right, this doesn't work right, your

2   pancreas, your heart.  I've been in for heart surgery here.

3   There's no need for me to get heart surgery ever because I'm on

4   a diet that prevents heart surgery.

5        I've been to the top guy.  He wrote the book on this in

6   1999.  He wrote the textbook that all cardiologists read on

7   reversing and stabilizing heart disease.  I have to have that

8   because otherwise -- you know, having the disease.  So

9   everything that they're doing, not being on a protocol that

10  stops the disease in me -- it doesn't work for everybody.  But

11  you have to -- and then you have to modify that protocol.

12       THE COURT:  Just a second.  Could I have a sidebar for

13  a second?

14                          -  -  -

15     (The following proceeding was held at sidebar.)

16       THE COURT:  Mr. Golden, I understand that maybe you

17  didn't have an opportunity to sit with your client and prepare

18  him for this testimony which is why -- though your questions

19  haven't called for it, he's given -- you represented to the

20  Court at sidebar that you weren't going to get into medical

21  testimony primarily because we don't have a medical expert here

22  today.  All this has been is medical testimony.  He divines it

23  and he says it.  He says it with authority.  There is no basis

24  for any of this testimony.  I asked you specifically, if you're

25  going to go down this road, at least establish a basis for it.

31

1        I don't know what his level of expertise is that forms

2    the basis of him being a scientist.  But I know that he is a

3    scientist who worked at Battelle, you know.  I know what he's

4    not, and he is not a medical doctor.

5        I don't recall any medical doctor -- he has this guy in

6    Florida that he claims is substantiating all this, but that's

7    not part of this record.  It's almost Trumpian.  He says this

8    is what happened and hence it is.  It turns evidence, as we

9    know it, on its head.  I'm the last judge who would allow that

10   in his or her courtroom.  I'm a stickler for evidence and

11   procedure so much so that you might say it's almost like a

12   fetish because I want clean records and I want a record that,

13   on review, a reviewing court will be able to say this is

14   correct or this is incorrect.

15       I know that you're not responsible for it in some

16   respects because you can't believe this -- just put a witness

17   on the stand and let him testify about his medical condition

18   even though he has no basis for it, he has no expertise in it,

19   but he can go on and discuss it authoritatively.  Then somebody

20   is going to expect me to say I'm going to rely on that to make

21   an important decision.

22       This case is not about his medical condition.  This is

23   not a motion for compassionate release.  This case is about

24   whether he is in compliance.  It started with him just refusing

25   to sit for a judgment debtor's examination which he agreed to

32

1    do in his plea agreement.  This is the bright, shiny object.

2    Whatever the disease -- I have it written in my notes, but

3    that's the bright, shiny object while the real issue in this

4    case exists someplace else.

5        I want to know, A, how much more of this do you have and

6    when are we going to get to the issues germane in this case?

7    Because I do deep dives.  I've never been distracted by the

8    bright, shiny object and I'm not being distracted now.  I know

9    this is his theory of the case:  "I'm sick."

10        Maybe he could spend as much time talking about how the

11   Belizian trust operates so that we will understand how we can

12   get to the gold or the loot or whatever he has control over and

13   knowledge of.  That's how he -- as one of the lawyers pointed

14   out, he has the key to his own cell.  All he has to do is say,

15   Judge, the gold is in Belize or Newport News, Virginia, or

16   whatever it is as opposed to talking about this because this is

17   the -- is a giant road to nowhere if you're trying to persuade

18   this Court.  Because it's just a bright, shiny object,

19   Mr. Golden.  It proves nothing.

20        MR. GOLDEN:  May I?

21        THE COURT:  As long as you're going to tell me

22   something that's relevant because I spent the last hour

23   listening to impertinent irrelevancies.

24        MR. GOLDEN:  I'm sorry.

25        THE COURT:  It's not your fault.  Please continue.

33

1          MR. GOLDEN:  I'm doing the best I can.

2          THE COURT:  I understand.  Please continue.

3          MR. GOLDEN:  I'm trying to stay away from the medical

4    stuff.

5          THE COURT:  You're being ineffective in that respect.

6    But you know that.

7          MR. GOLDEN:  I'm trying to cut him off where I can.

8    I'm trying to demonstrate the continued incarceration, the

9    impact that has on him physically, and I'm trying to stay away

10   from the medical stuff.  I'm about done with it.

11         THE COURT:  Okay.

12         MR. GOLDEN:  Believe me.  I'm not trying to push the

13   envelope.

14         THE COURT:  I know.  I've listened to your questions.

15   His answers have been largely unresponsive.  I appreciate the

16   fact that you're trying to keep him on track.

17         MR. GOLDEN:  Okay.

18         THE COURT:  I'm just telling you it's been

19   ineffective.

20         MR. GOLDEN:  I understand.  Thank you.

21        (The following proceeding was held in open court.)

22     BY MR. GOLDEN:

23   Q.   I want to switch gears and ask you some questions

24   relative to your ability to comply with the judge's order.

25         Do you presently know where these subject coins are

34

1   physically located?

2   A.   No, I do not.

3   Q.   Do you -- you set up the Belize trust?

4   A.   Yes.

5   Q.   Do you remember when that was set up?

6   A.   I don't know.  Maybe 2010.

7   Q.   Okay.

8   A.   2009.

9   Q.   Okay.  It was well before this proceeding.  Would that

10  be fair to say?

11  A.   Yes.

12  Q.   Do you recall and do you understand the terms of the

13  trust that you signed?

14  A.   Well, it's hard for me to interpret all of it.  I think

15  they interpret it where the trust is.  But I have a sense of

16  it, yes.

17  Q.   At the present time, do you believe that you could call

18  the trustee and say give the coins to the receiver?

19  A.   No, I cannot do that.  The terms of the trust are that

20  if you're in a litigation, the trust -- the trustee and the

21  people that control the trust put the trust in what they call

22  duress, and you can't -- they won't give you any information.

23  They won't do anything.  They can do whatever they want.

24  Q.   Did the trust include a power of attorney to the

25  trustee?

35

1    A.    I'm sure it did.

2    Q.    Okay.  Do you know about this protector?  Do you know

3    what the protector is?  Can you tell the Court about the

4    protector?

5    A.    Well, I don't know that much about it.  But as part of

6    the trustee system, there is a protector that's a separate

7    entity, as I understand it, than the trustee itself that

8    protects the trust.

9    Q.    Did the trust include the ability of the trustee to move

10   the res, as we say, the property that's in the trust to

11   wherever he wanted to move it?

12   A.    Yes.  They can move it to wherever they want to move it.

13   In fact, they probably wouldn't keep it in Belize anyway.  They

14   would probably keep in some other jurisdiction from the start.

15   Q.    Since this case has occurred, have you given any

16   instructions to the trustee to move it, hide it, liquidate it,

17   or anything like that?

18   A.    No.  I don't think that's probably in my purview at all.

19   Q.    Do you believe today that you have the ability to comply

20   with the Court's purge order consistent with the terms of the

21   trust?

22   A.    No.

23   Q.    Do you believe that your further incarceration would

24   lead to that end result that would cause you to do that?

25   A.    No.  It's not going to -- it's never going to change.

36

1        MR. GOLDEN:  I have nothing further.

2        THE COURT:  Thank you, Mr. Golden.

3      Cross-examination, Mr. Glenn-Applegate?

4        MR. GLENN-APPLEGATE:  Just a few questions.  Thank

5   you, Your Honor.

6                         -  -  -

7                   CROSS-EXAMINATION

8   BY MR. GLENN-APPLEGATE:

9   Q.   Mr. Thompson, today you've been sitting for and

10  answering questions from the attorneys in this case.  Are you

11  willing to sit for and answer questions in a debtor's

12  examination?

13  A.   I think I've already almost broken records with regard

14  to sitting for a debtor's examination.  You know, they accuse

15  me of being -- I can't remember the term right now because of

16  my brain.  But they didn't believe what I said.  It's all there

17  in my debtor's examination.

18  Q.   I'm sorry to interrupt you, Mr. Thompson.  I'm not

19  asking you about what happened in a past debtor's examination.

20  I'm asking you are you willing to sit for and answer questions

21  in a debtor's examination?

22  A.   Isn't that a legal question?  I don't know if I'm

23  obligated to do that or not.

24  Q.   I'm not asking whether you're legally obligated to do

25  it.  I'm asking if you're willing to do it.

37

1    A.    I would have to talk to my attorney about that,

2    Mr. Applegate.

3    Q.    You testified on direct that you could not, under your

4    understanding of the terms of the Belizian trust -- that you

5    could not call the trustee and tell the trustee to turn the

6    coins over to the receiver.  My question is this.  Have you

7    tried to call the Belizian trustee and tell the trustee to turn

8    the coins over to the receiver?

9    A.    I can't call anybody, hardly, from in here.

10    Q.    I'm not asking what you can and cannot do.  I'm asking

11    what you have done.  Have you tried to do that?

12    A.    I can barely get an attorney in here, Mr. Applegate.  I

13    can barely talk an attorney into doing it because everything is

14    recorded from here.  I can't do anything.

15    Q.    I'm interpreting your answer to be a no.  Is that

16    correct?

17    A.    You get ten minutes a day to talk on the phone.  No.

18    You're right.  That's right.  I'm sorry.  I'm trying to be

19    specific.

20    Q.    I'm trying to make my question specific, Mr. Thompson.

21    A.    Okay.  I appreciate that.

22    Q.    Are you willing to execute a limited power of attorney

23    that would allow another person to probe the Belizian trust?

24    A.    No.

25    Q.    You're unwilling to execute that?

38

1    A.    I can't find an attorney who would recommend that.

2    Q.    I'm not asking about that.  I'm asking whether you're

3    willing to do it.

4    A.    No.

5    Q.    Are you willing to take any steps whatsoever to assist

6    with the recovery of the assets?

7    A.    I don't think I can do -- there's nothing I can do to

8    assist with the recovery of the assets.

9    Q.    I understand your general position is any steps you take

10   would be ineffective.  I want to be clear that that's not my

11   question.  I'm not asking whether you anticipate any attempts

12   to be effective or not.  I'm asking whether or not you are

13   willing to try.

14   A.    Well, during the deposition, they already called the

15   Belizian trust and established that the trust is there.  And

16   the more we mess with them, the longer it's going to be under

17   duress.  Is that the goal we're trying -- is that what we're

18   trying to do?

19         We don't know what their rules are down there.  They're

20   not in the business of giving stuff back down there.  They're

21   in the business of keeping stuff.  It may be in duress ten

22   years from now.  We don't know what they're doing.

23   Q.    Mr. Thompson, I want to be clear about the scope of my

24   question.  I'm not asking you whether you are willing to take

25   steps that you believe will be effective.  I'm asking you

1   whether you are willing to take any steps at all, whether you

2   believe them to be effective or not, to assist with the

3   recovery of assets?

4    A.   No.

5         MR. GLENN-APPLEGATE:  Okay.  No further questions,

6   Your Honor.

7         THE COURT:  Any redirect, Mr. Golden?

8         MR. GOLDEN:  No, Your Honor.

9         THE COURT:  Mr. Golden, do you have any summary

10  remarks you wish to make?

11        MR. GOLDEN:  Yes, I do have.

12        THE COURT:  Yes.

13        MR. GOLDEN:  Your Honor, first, it's -- I kind of

14  regret being back here in a certain way; but, then again, I'm

15  willing to be here.  I've been involved in this matter for

16  quite some time and I have an interest in seeing that this be

17  resolved.

18        I'm very mindful of the motion -- I'm sorry, your order

19  of September and the issues that are raised in this particular

20  matter.  As the Sixth Circuit pointed out when they had their

21  arms around this case, this is a very unique case.  My

22  experience has predominantly been in the area of

23  quasi-criminal.  I have quite a bit of experience in that, in

24  the area of people not paying child support and they are given

25  purge orders.  And it's the flip-flop of this where they say

1   you got 25 days in jail but you can purge by paying $50 a week,

2   as opposed to here you're in jail until you purge.

3        This is quite unusual.  I understand the dilemma that's

4   presented to the Court under the circumstances of all of this,

5   especially where we are today.  I believe that consistent --

6   that the underlying purpose of this is this is supposed to be a

7   coercive effect.  This is not supposed to be necessarily a

8   hammer over someone's head as much as an influence, a coercion,

9   not necessarily to penalize them under the circumstances.

10       I keep hearing static.

11          THE COURT:  So do I.

12          MR. GOLDEN:  I think that we're way beyond that at

13  this point.  As I indicated, Mr. Thompson has been incarcerated

14  for 76 months as of now, plus 11 months before that.  So he's

15  been in jail for 87 months.

16       When we look at this thing, you and I together have

17  sentenced people for crack cocaine for less than this.  We've

18  had people that have done more significant things criminal in

19  nature.  This is civil in nature.  The sad part is this case

20  started out as a civil matter.  I think Mr. Williamson was the

21  original plaintiff that filed over in front of Judge Sargus and

22  it ultimately ended up with you.  This was a civil matter to

23  start and it's still a civil matter today.

24       The interested parties -- and as you know, I was

25  involved in the civil suit.  The interested parties have

41

1   judgments.  They're executing upon the judgments.  In fact,

2   they've recently utilized you to get an order to go through the

3   boxes -- the 76 or 78 boxes in the interest of execution upon a

4   judgment.

5        So this case started out as a civil case.  It's still a

6   civil case.  It will always be a civil case.  I'd say what I

7   find, and I submit to you, is what started out as an

8   accommodation by the Court to let civil litigants utilize the

9   inherent judicial powers of the Court has gone way out of

10  whack, plain and simple.  I'm not being offensive to you.  I

11  believe everything you've done is within your authority and

12  what you're expected to do, but you've been taken advantage of

13  by them.  I believe that if -- somebody lost track of what was

14  going on then, and I believe it was the pushing of one of two

15  of the interested parties.  I don't want to start disparaging

16  them, but I believe that's where this system got manipulated,

17  where the criminal menu of this building was utilized for a

18  civil proceeding.

19       In the interim, during the 76 months when it first

20  started out, there were no judgments.  There was a

21  receivership, ultimately.  Then now that's all been reduced to

22  judgments.  They have judgments now.  They're executing upon

23  the judgments.  I, as a collection attorney, do it all the

24  time.  I take people's cars.  I garnish their bank accounts.  I

25  garnish their wages.  I execute on property.  Been there, done

42

1    that.  That's what they're doing, and that's what they should

2    be doing now that they have judgments.  But before they got

3    that, they utilized the inherent powers of the Court.  And then

4    here is an individual who is not resolving a civil matter and

5    it's become where he's in jail now.

6         We always hear things about debtor prison.  Is this

7    debtor prison?  Well, someone might say it is.  I'm not going

8    to stand here and say this is debtor prison.  But they do have

9    judgments and he is in jail now, and he's not satisfying the

10   judgment.  Someone could argue to you he's not satisfying your

11   purge order, but he is also at the same time not satisfying the

12   judgment.  Whereas, when this case started out 76 months ago,

13   it was a different story.

14        THE COURT:  I don't want the lines to be blurred, nor

15   do I want the record to have the wrong implication.  The Sixth

16   Circuit has ruled on the Court's imposition of this prison time

17   because he was in contempt, and the judgment of the Sixth

18   Circuit was unanimous.

19        I understand what you say, Mr. Golden, and a lot of what

20   you say are things with which I agree.  But I don't want you to

21   make the same mistake that Mr. Thompson continues to make.  As

22   an objective officer of the court, I want you to address the

23   issues germane to this.

24        MR. GOLDEN:  I understand.

25        THE COURT:  Not a continuation of Mr. Thompson's

43

1   diversions. He does own the key to his cell. He's owned it

2   for 76 months. All he has to do is comply with what he agreed

3   to do. All he has to do is tell the truth. I know that the

4   truth kind of has, seemingly, in some public discourse

5   certainly, been relegated to the dustbins of history. But not

6   in this court. In this court, the truth still prevails. Once

7   he comes to terms with the importance of truth in this case,

8   then that will be the key that will indeed unlock his door.

9       I don't want you to make -- the process is the process.

10  The process has been validated by the Sixth Circuit. You know

11  the process. I know the process. It's telling that not once

12  did you argue that the process was being -- was in some

13  respects unconstitutional or not keeping with the rules of

14  practice or procedure. No. This is what happens in

15  circumstances like this.

16      His testimony was telling. He wouldn't answer any of

17  the critical questions that Mr. Glenn-Applegate asked, the

18  questions that would unlock his jail cell. Instead, everybody

19  wants to talk about myalgic encephalomyelitis or whether he has

20  judgments against him. This case is not about whether he has

21  judgments against him. That was the state court proceeding.

22      I am going to ask that everybody focus on the issues

23  germane to the federal court proceeding and let's not look at

24  the bright, shiny object that is known -- you remember, when we

25  took the bar exam, there was always one question that was the

44

1   distracter.  It was patently wrong, but if you didn't know the

2   answer or didn't understand the area of law, it might have an

3   appeal.  That's why they called it a distracter.  It can

4   initially get your attention because it seems to be relevant

5   and then it takes you down a rabbit hole.

6           MR. GOLDEN:  I can assure you, Your Honor, I'm not

7   trying to distract you.  There's just certain points I feel as

8   though I must address to you.

9           THE COURT:  That's what everyone says when they want

10  to distract.  I'm really not trying to distract you, but I have

11  to tell you about this irrelevant bit of material.

12          So that's not relevant.  Let's talk about the issues

13  that brought us here.  If you want to go historical, talk about

14  the issues that brought us here.  Or if you want to stay in the

15  present, talk about what he needs to do to purge his contempt.

16          MR. GOLDEN:  Okay.

17          THE COURT:  Where is that evidence?

18          MR. GOLDEN:  Well, at this point, I believe the best

19  evidence I've given in that regard is he is incapable of

20  complying with the Court's order.  As Mr. Applegate elicited or

21  attempted to elicit, that it may be not an incapability as much

22  as he just doesn't want to do it.

23          THE COURT:  Words are our stock-in-trade.  I know that

24  you wouldn't take to the bank his incapability, but you would

25  take to the bank his unwillingness.

45

1      MR. GOLDEN:  I'll get right to the germane issues.

2  That is the coercive -- as you pointed out in your order, the

3  question of the -- and this is one of the issues:  Is this

4  order still to be enforced?  Is it still coercive or have we

5  passed over the line and it's now punitive?  I believe that's

6  one of the issues.  I submit to you --

7      THE COURT:  The legal question becomes whether, with

8  the passage of time, it automatically becomes punitive or it

9  remains coercive.  The purpose of the incarceration has not

10  changed, from the Court's vantage point.  None of that has

11  changed.  The only thing that's changed is his persistence in

12  not purging himself of the contempt.  Only he has the ability

13  to do it.  If I had the ability to purge him of the contempt, I

14  would do so because I derive nothing from having Mr. Thompson

15  incarcerated.

16      MR. GOLDEN:  Can I ask you a question with that

17  regard?

18      THE COURT:  Typically, that's not how this work.  But

19  you do have the expressed permission to continue to make

20  evocative statements that are germane to the issues in this

21  case.

22      MR. GOLDEN:  I would submit to you that I would

23  believe that if the Court had the ability to order the Belize

24  trustee to give the information, that would be -- we'd be done.

25  If the Court doesn't have the ability, I believe that -- I

46

1   would submit that if the Court had the ability to do so, it

2   would do so.  Okay?  And that if that was the case, then that

3   would indicate that he has the ability to tell the trustee to

4   do this.

5              THE COURT:  Who set up the trust, Mr. Golden?

6              MR. GOLDEN:  Pardon me?

7              THE COURT:  Who set up that Belizian trust?

8              MR. GOLDEN:  He set it up.  They wrote it.  I mean,

9   it's their design.  It's a Belize trust.  I understand what

10  you're saying.  But I believe that the terms that are in there

11  are essentially -- he has no more ability to order the trustee

12  to cooperate than a court would.  That would be what I would

13  submit to you, that we're in the same boat.

14             He has testified what it is.  I believe everybody's read

15  the trust.  They have access to the trust and it is what it is.

16  One of the features of this trust is -- and this is why people

17  do business, royalty and people with a lot of money do put

18  their money in Belize in these trusts is for cases -- not

19  necessarily cases like this, but also other situations where

20  someone is holding a gun to your head and being held prisoner,

21  give me your money.  The trustee says, sorry, not going to

22  cooperate.  That's one of the -- I guess, the kind of

23  predicaments that we have.

24             But getting back to the issue as you just indicated: Has

25  this inherently become or automatically become a penalty?  I

47

1   would submit that it has after 76 months.  That continued

2   incarceration of Mr. Thompson, if it hasn't happened after 76

3   plus 11 months, excuse my French, it ain't happening.

4        THE COURT:  That argument has some legal appeal,

5   Mr. Golden.  But what I would -- the reason that I would prefer

6   a written motion, if that's going to be what this has morphed

7   into, is that you can cite cases which tell me after a certain

8   point this becomes punitive and no longer coercive as is the

9   goal under these types of orders.  Then you can probably find

10  cases which would discuss whether that rationale is a solid

11  rationale.

12       Because, as you very well know, what could then happen

13  is if there is a bright line, a contemnor could simply wait it

14  out and then he would be discharged.  He wouldn't have any

15  legal obligations necessarily to discharge.  He would never

16  have to disclose the location of the trust res or the assets,

17  if you will, because he made it through the period.  He stayed

18  so long or he abided by the incarceration long enough that it

19  was no longer coercive but punitive.  So the way you get around

20  contempt orders is wait it out because then, by operation of

21  law, it has lost its coercive purpose and has become punitive.

22       So if you're going to make that argument, that's a fine

23  argument to make.  You're going to have to submit it in writing

24  with cases as we do for all of our motions.  You just can't

25  make that argument without any case support to buttress your

48

1    argument.

2         MR. GOLDEN:  Well, I believe that in the government's

3    response to Mr. Thompson's December motion, he -- the

4    government points out the -- I could say kind of the pivotal

5    cases, the *Armstrong* and the *Bagwell* cases.  Those are really

6    the major cases.

7         THE COURT:  I understand.  You do know the part where

8    I ruled on those.  What I'm saying is if that's going to be

9    your argument, then simply commit it to writing.  There may

10   have been some other cases that have come down since those that

11   will support your position.  I'm sure that if they're out

12   there, you will find them.

13        MR. GOLDEN:  There's one more point that you just

14   raised that I'd like to address and that's the indefinite

15   nature.  Then it is the question:  Can somebody be held

16   indefinitely until such time as they comply?  Or you can just

17   rot away in jail?  That's just essentially the way it is.  It's

18   indefinite.

19        I believe that there's citations that say that's --

20        THE COURT:  Mr. Golden, now, as experienced as you

21   are, we aren't going to rest on your belief as to citations

22   because it's a simple matter for you to sit down at your

23   computer, draft your argument, craft your argument, cite the

24   cases.  You don't have to wonder about the citations.  It's

25   like the Court.  I have to decide concrete cases of

49

1  controversy, not hypotheticals.

2       What I'm telling you is that you may make these

3  arguments.  They must be in writing because it will give you an

4  opportunity to collect all of your thoughts and, more,

5  importantly, to collect and to cite all of your authority that

6  support the propositions you now express.

7       MR. GOLDEN:  Okay.

8       THE COURT:  All right.  Now, I'd like to hear from the

9  government if you're done.

10      MR. GOLDEN:  I think that at this point we've covered

11  everything.

12      THE COURT:  I think that you have.  I think that you

13  have thoroughly.

14      MR. GOLDEN:  Right.  And I believe that your order

15  indicated exactly what you're saying now, that you want me to

16  go in further detail.

17      THE COURT:  We'll get to that after I hear the

18  government's rejoinder.

19      MR. GOLDEN:  Okay.

20      MR. GLENN-APPLEGATE:  Thank you, Your Honor.

21      I'll be brief.  I just want to lay out for the Court how

22  we analytically view this question because I think it's two

23  separate questions for the Court to consider about whether

24  Mr. Thompson should remain confined.  There is the

25  constitutional question that we view he raised in his pro se

50

1   motion, namely, would continued incarceration violate the due

2   process clause.  And then there is the related but analytically

3   distinct question of whether the Court should continue to

4   exercise its discretion in imposing confinement as the subject

5   of contempt.  I think those are two separate questions.

6        We will respond in full to whatever Mr. Golden files,

7   but I'll just give you the brief answers to each and then we

8   can fully answer these in writing.

9        Continued incarceration would not violate the due

10  process clause because Mr. Thompson has not established he's

11  unable to comply with the Court's order.  The Supreme Court has

12  said that a contemnor may be confined indefinitely until he

13  complies with an affirmative command.  The Court has given him

14  an affirmative command repeatedly over the years and again

15  today.  He indicated he is not unable to comply.  He is

16  unwilling to comply.

17       Today he said he was unwilling to sit for and answer

18  questions at a debtor's exam, at least without consulting his

19  attorney first.  He said he has not tried to call the trustee

20  to tell them to turn over the coins.  He's not willing to

21  execute a limited power of attorney, and even answered "no" to

22  my broad question of whether he's willing to take any steps

23  whatever to assist in the recovery of assets.  That's an

24  unwillingness.  That's not an inability.  If he tried and tried

25  and tried and it all failed, fair enough.  Then maybe the

51

1   constitutional questions would come into play.  But that's not

2   what we have here.

3        Then there is the separate question of whether continued

4   confinement is an appropriate exercise of the Court's

5   discretion.  Here, I think Mr. Golden and I are closer to

6   seeing eye to eye, which is to say this, that the civil

7   contempt sanction was on the Court's own order.  It's inherent

8   in the power of the Court, and the Court exercises discretion

9   when imposing contempt sanctions.

10       Given the duration of Mr. Thompson's incarceration, we

11  think it's reasonable to question whether further incarceration

12  will ever coerce him into compliance.  I want to be clear.

13  That's not because he's unable.  Just if he's been unwilling

14  for this long, he may be unwilling forever.  In our view, it

15  would not be an abuse of the Court's discretion if the Court

16  said, okay, that's enough.  But to be very clear, it would not

17  be a violation of the Constitution if the Court thought

18  otherwise.

19       As I said, we're willing to fully brief these in

20  response to Mr. Golden's motion.  I just wanted to give a

21  headline version of how we view the two questions in this case.

22       Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Glenn-Applegate.

24       Here is what I'm going to do.  I'm going to -- even

25  though you earlier stated, Mr. Golden, that you were fine to

52

1  rest on Mr. Thompson's pro se motion, in light of your argument

2  and in light of the questions that you raised, I'm going to

3  have you file an amended motion. Would 30 days be sufficient?

4          MR. GOLDEN: That would be.

5          THE COURT: Thirty days from today it will be due.

6      Mr. Glenn-Applegate, since you've already taken one stab

7  at this and are familiar with these issues, I'm going to give

8  you two weeks to reply. Then I'll give you two weeks -- I'm

9  sorry, Mr. Glenn-Applegate, to file your memorandum contra.

10  Then, Mr. Golden, I'll give you seven days to reply, and then

11  we can wrap this matter up. All right?

12      Is there anything else that we need to take up from the

13  government, Mr. Glenn-Applegate?

14          MR. GLENN-APPLEGATE: No. Thank you, Your Honor.

15          THE COURT: Anything further from the defense,

16  Mr. Golden?

17          MR. GOLDEN: No. Thank you, Your Honor.

18          THE COURT: Thank you very much, everyone. This

19  matter is adjourned.

20      (Proceedings concluded at 9:59 a.m.)

21                              - - -

22

23

24

25

53

C E R T I F I C A T E

I, Shawna J. Evans, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable Algenon L. Marbley, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


s/Shawna J. Evans_____
Shawna J. Evans, RMR, CRR
Official Federal Court Reporter


April 27, 2023