**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | **Case No. 2:15-cr-00081** |
| v. | : | |
| | : | **Judge Algenon L. Marbley** |
| THOMAS G. THOMPSON, | : | |
| | : | |
| Defendant. | : | |

<u>**OPINION & ORDER**</u>

This matter comes before this Court on the following motions: Defendant Thomas G. Thompson's *Pro Se* Motion to Rescind Contempt Order (ECF No. 257), Amended Motion to Rescind Contempt Order ("Amended Motion") (ECF No. 283), Sealed Motion for Updated Medical Tests (ECF No. 293), Motion to Render Decision on Amended Motion or to Schedule an Expedited Hearing (ECF No. 294), and Sealed Supplemental Motion in Support of Amended Motion ("Supplemental Motion") (ECF No. 308); Proposed Amicus Curiae's Motion for Leave (ECF No. 295); and a Joint Motion for Entry of Interim Judgment filed by Interested Parties, The Dispatch Printing Company and John Pidcock as Trustee of The Recovery Limited Partnership Trust (ECF No. 298).

For the reasons set forth below, this Court **GRANTS IN PART** Mr. Thompson's Amended Motion and Supplemental Motion (ECF Nos. 283, 308) and **TERMINATES** Mr. Thompson's current incarceration for civil contempt. Thompson's civil contempt fine is hereby **FIXED** in the sum of <u>**$3,335,000.00**</u>, due after Thompson's completion of his two-year criminal sentence and pursuant to a payment schedule to be established by this Court. Thompson's criminal sentence is hereby **REINSTATED**; and the Clerk of the Court is **DIRECTED** to enter Thompson's criminal

1

Judgment in accordance herewith. Thompson **shall** remain incarcerated and begin his two-year criminal contempt sentence immediately. Thompson's Pro Se Motion (ECF No. 257); Sealed Motion for Updated Medical Tests (ECF No.  293); Motion to Render Decision on Amended Motion or to Schedule an Expedited Hearing (ECF No.  294); and Proposed Amici's Motion for Leave (ECF No. 295) are **DENIED AS MOOT**. Interested Parties' Joint Motion for Entry of Interim Judgment (ECF No. 298) is **DENIED WITHOUT PREJUDICE.**

## I.      BACKGROUND

This case arises from the decades-long legal battle over the treasures recovered from the *S.S. Central America*, a steamship laden with some 21 tons of California gold that sank off the Carolina coast in 1857.  Over a century later, acting through the Recovery Limited Partnership and various other entities, Defendant Thomas Thompson solicited financing and assembled a crew to find and recover the Gold Rush-era shipwreck.[1]  In what remains "one of the most significant finds in maritime history," Mr. Thompson successfully located the shipwreck in 1988 and resurfaced gold coins, bars, and ingots worth up to $400 million.  *See Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 611 (6th Cir. 2013) ("*Williamson II*") (discussing this factual background).

But back at the docks, a lawsuit awaited him. Companies that had insured the loss of *S.S. Central America* sued Thompson in 1989 in the Eastern District of Virginia claiming they were owed the gold that he found. *See Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 458 (4th Cir. 1992)  Following two trials and two appeals, the Fourth Circuit determined in 1995 that Thompson and his entities were entitled to a salvage award of 90% of the value of the

---

[1] The Dispatch Printing Company ("The Dispatch" or "TDPC"), an Interested Party in this case, was one financier; the other Interested Party, John Pidcock, is Trustee of the Recovery Limited Partnership Trust.

gold and artifacts recovered. *See Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 568–75 (4th Cir. 1995). In July 2000, the district court closed the case. *See Recovery Ltd. P'ship v. Wrecked & Abandoned Vessel S.S. Cent. Am.*, 790 F.3d 522, 525 (4th Cir. 2015).

### A. Civil Proceedings in *Williamson*

Several years later, a group of investors and former crewmembers sued Thompson and the related business entities (together, "Civil Litigants") in Ohio state court, seeking to recover their promised share of the proceeds. In addition to monetary relief for breach of contract, conversion of the recovered gold, and breach of fiduciary duty, the *Williamson* plaintiffs requested the imposition of a constructive trust upon the defendants and an accounting of their finances. *See Williamson v. Recovery Ltd. P'ship*, No. 2:06-CV-292 ("*Williamson I*")*, 2011 WL 2181813, at *7 (S.D. Ohio June 3, 2011) (Sargus, J.). The cases were ultimately consolidated and removed to this Court in April 2006. *Id*.

A voluminous procedural history before the Honorable Edmund Sargus, Jr. followed, during which "several substantial assets [were] transferred" to Thompson, including 500 gold "restrike coins"[2] and a severance or termination trust, established for the benefit of Mr. Thompson. *See Williamson I*, 2012 WL 13118448, at *6–7 (S.D. Ohio July 31, 2012); *see also Williamson II*, 731 at 617 ("The location of the severance-trust corpus and the gold restrike coins was initially unknown to the plaintiffs. During the course of litigating the preliminary-injunction motion, it was discovered that both had gone missing."). The district court ordered Thompson to explain what happened to the gold restrike coins and the severance-trust corpus, enjoining him "from

---

[2] According to the *Williamson* plaintiffs, they are called "restrike" coins "because they were created through the melting of gold ingots recovered from the Central America, and then struck using original 1850s-vintage coin casting dyes owned by the California Historical Society." *Williamson I*, ECF No. 708 at 11 (June 18, 2012).

transferring or selling any portion of the gold restrike coins or the severance-trust res in his possession or his residence in . . . Florida" and "from transferring or selling any assets that could be used to satisfy a judgment against it, other than those necessary in the ordinary course of its business." *Williamson II*, 731 F.3d at 617; *Williamson I*, ECF No. 738.

In a declaration submitted to the court, Thompson indicated that the gold coins were placed in an irrevocable trust and "that he has never seen the coins nor had physical possession of them." *Williamson I*, 2012 WL 13237586, at *2 (S.D. Ohio Aug. 6, 2012). As to the termination trust, Thompson stated that it was dissolved in 2004 and that "[t]he funds paid to [him] from the Termination Trust . . . [we]re no longer in his possession," having been "long since gone and used for various expenses." *Id*. Unsatisfied with these submissions, the district court nonetheless gave Thompson an opportunity to appear at a hearing and "explain why his actions do not constitute contempt, why his transfer of the gold restrike coins was not a fraudulent conveyance, and what happened to the Termination Trust." *Id*. The court also entered a temporary restraining order prohibiting the irrevocable trust, as identified by Thompson in his submissions and believed to be a Belize offshore entity, "from disposing of, encumbering, transferring or diminishing in value in any way the 500 gold restrike coins." *Id*.

Rather than appear at the hearing, Mr. Thompson absconded, leading the court to issue an arrest warrant. *See United States v. Thompson*, No. 2:15-CR-081, 2022 WL 4182364, at *2 (S.D. Ohio Sept. 13, 2022) (Marbley, J.) (summarizing proceedings).

## B.  Criminal Contempt Proceedings

With Thompson still at large, the Government in March 2013 opened these criminal contempt proceedings against him, charging him with "disobey[ing] or resist[ing] a lawful writ, process, order, rule, decree, or command of a court of the United States by failing to comply with

4

the orders of Judge Edmund A. Sargus Jr," in violation of 18 U.S.C. § 401(3). (ECF No. 3 ¶ 23). An arrest warrant issued and was executed about two years later, when Thompson was eventually located in Florida and returned to this district, this time before the Honorable Algenon L. Marbley. *Thompson*, 2022 WL 4182364, at *2.

Within a few months of his arrest, Thompson pleaded guilty to the criminal contempt charges pursuant to a Rule 11(c)(1)(C) agreement. Among its terms, the plea agreement required Thompson (1) "to assist the Parties in [*Williamson*] and any other party . . . having an interest[] in identifying and recovering the missing assets"; and (2) "to testify under oath at a proceeding, amounting to a debtor's examination, to identify and recover assets." (*See* ECF No. 14 ¶ 4). Pursuant to the agreement, this debtor examination "shall include, but is not limited to, questions regarding the gold strike commemorative coins which were the subject of previous orders in [*Williamson*]." (*Id.*).

## 1. Civil Contempt Order

This Court subsequently ordered Mr. Thompson to "submit to a debtor's examination, pursuant to the terms of his plea agreement." (ECF No. 33). Thompson sat for a debtor's examination in October 2015 but "was not forthcoming in his answers to counsels' questions." (ECF No. 50). He was then ordered to submit to a second debtor's examination and warned that failure to cooperate with the procedure amounting to a debtor's examination under his Plea Agreement "would result in an order to show cause why he should not be held in contempt." (ECF No. 63 (citing ECF No. 50)). A second examination took place on December 14, 2015, and Thompson "refused to answer any questions on that day either, citing an autoimmune disorder that he claims adversely affects his cognitive ability." (ECF No. 63).

On December 15, 2015, this Court held a show cause hearing on Thompson's failure to comply. The Government introduced transcripts from the debtor's examination, taken a day earlier, "that clearly demonstrated Defendant's refusal to cooperate in the examination." (*Id.* at 4). Based on this clear and convincing evidence, this Court held Thompson in civil contempt and ordered him "to be incarcerated and pay a fine of $1,000.00 per day until he purges himself of the civil contempt." (*Id.*).

That same day, this Court convened a sentencing hearing for Thompson's criminal contempt conviction. Consistent with the terms of his plea agreement, this Court imposed a two-year term of imprisonment, a one-year term of supervised release, 208 hours of community service, a $250,000 fine, and a $100 special assessment for criminal contempt of Judge Sargus's orders in *Williamson*. (ECF No. 67, Tr. 37:13–39:8, 42:18). The criminal sentence, however, was tolled until Thompson "cures his civil contempt." (ECF No. 63). This Court likewise reserved entry of the criminal judgment pending Thompson's purge of the civil contempt order.[3]

To summarize then, Mr. Thompson remains incarcerated for civil contempt based on his failure to honor the terms of his plea agreement and this Court's orders. His two-year criminal contempt sentence, which was suspended until he purges himself of the civil contempt, has yet to begin. Over the intervening period since his 2015 arrest, Mr. Thompson has challenged the civil contempt order in various ways but has remained steadfast in his refusal to cooperate. As this Court once observed, that's the odd thing about Mr. Thompson: He can remember everything that would

---

[3] *See Thompson*, 925 F.3d 292, 296 (6th Cir. 2019) (citing *United States v. Thompson*, No. 15-4424 (6th Cir. Nov. 21, 2016) (order) ("The district court's failure to enter a judgment in Thompson's case is not a procedural oversight. Instead, the district court expressly reserved entry of the judgment pending Thompson's purge of a civil contempt order entered in the same case.")).

help him mount a defense for why he should not comply, but he has feigned ignorance on anything that would point to the whereabouts of the gold. (*See* ECF No. 115, Tr. 17:23-25, 19:16-28).

### 2. Post-Incarceration Proceedings

In May 2016, this Court ordered Thompson to undergo an independent medical exam by Dr. Bob Stinson, a forensic psychologist, to probe Thompson's neurological condition insofar as it may interfere with his ability to comply with the terms of his plea agreement. (ECF No. 72). After Dr. Stinson submitted his report (ECF No. 75 (SEALED)), Thompson filed a motion to allow a physician of his choice, Dr. Martin Ryan, to visit him and conduct a separate medical examination, which this court granted. (ECF No. 80). Shortly after this Court received Dr. Ryan's reports (ECF No. 81-82 (SEALED)), Thompson filed a motion seeking further medical testing in pursuit of a diagnosis of "Myalgic Encephalomyelitis (ME) which is associated with Chronic Fatigue Syndrome and is now known as Systemic Exertion Intolerance Disease (SEID)", as well as leave to travel to medical facilities for said testing. (ECF No. 83).

In September 2016, this Court held a competency hearing and, based on the two independent medical evaluations by Dr. Stinson and Dr. Ryan, concluded that Mr. Thompson "suffers from no neurological condition that would interfere with his ability to comply with the terms of his plea agreement, that he is malingering as to his purported lack of memory, and that he is being intentionally deceptive with respect to the whereabouts of the gold." (ECF No. 88). As to Thompson's motion for further medical testing (ECF No. 83), this Court denied the motion, explaining:

> Despite Mr. Thompson's best efforts, Dr. Ryan could not diagnose Mr. Thompson with SEID to a reasonable degree of medical certainty. Even though Dr. Ryan did not make such a diagnosis, he concluded with two opinions premised on the counterfactual question that Mr. Thompson had SEID. Dr. Ryan opined that a person with SEID: (1) could tire during the administration of the

TOMM, the test Dr. Stinson administered to detect malingering; and (2) could have become evasive during a deposition after having been dragged across the floor in shackles and in pain. Dr. Ryan did not say that Mr. Thompson, if diagnosed with SEID, suffers from total lack of recall, would not be able to comply with his plea agreement, or would not be able to recall the location of the gold coins. It is for this reason that the Court denied Mr. Thompson's request for additional testing, even though Dr. Ryan suggested that the presence of SEID could be confirmed by submitting Mr. Thompson for "a PET scan, CT scan, and MRI of the head and two repeat cardiopulmonary exercise tests (CPETs)." Additional testing for the presence of SEID is unnecessary because it serves no evidentiary purpose: a diagnosis of SEID would not show Mr. Thompson to have a failure of memory such that he could not comply with his plea agreement and cooperate in a deposition. *See, e.g., United States v. General*, 278 F.3d 389, 399 (4th Cir. 2002) (district court had discretion in determining whether to order additional mental examinations); *Ruud v. United States*, 347 F.2d 321, 323 (9th Cir. 1965) (affirming district court's determination not to appoint a second psychiatrist).

(ECF No. 88 at 4–5). Since that time, this Court has held countless interval hearings, repeatedly reminding Mr. Thompson that he holds the keys to his own release, but to no avail. (*See e.g.*, ECF Nos. 93, 99, 113, 114, 115, 116, 127, 130, 179, 200, 220, 222, 229, 233).

On January 5, 2017, Thompson sat for another debtor's exam, during which he was "uncooperative, stating dozens of times, 'I'm not prepared at this time to purge my contempt.'" (*See* ECF No. 108 at 1–2). With Thompson present, the parties had also initiated a call to the Belizean trust suspected to contain the 500 restrike coins. (*Id*.). During the telephone conversation, a representative of the trust confirmed the existence of the trust but would not divulge further information, including "identify[ing] assets and giv[ing] any specific asset information," without Thompson's consent. (ECF No. 99). Thompson refused to cooperate.

In April 2017, over Thompson's objections, this Court ordered him to execute a limited power of attorney to permit the parties to probe the contents of a Belizean trust, explaining that the plea agreement "does not limit Thompson's required cooperation to participation in a debtor's

examination" and instead "contemplates, among other things, exactly what the government seeks here: the signing of a limited power of attorney that allows the government to probe the contents of the Belizean trust." (ECF No. 108 at 3). Thompson, however, refused to comply. (*See* ECF No. 110 ("Defendant Thomas G. Thompson has not executed the limited power of attorney as of today, May 23, 2017.").

### 3. Motions for Relief from Incarceration

In June 2017, Thompson moved to terminate the civil contempt sanctions based on the Recalcitrant Witness Statute, 28 U.S.C. § 1826, which limits an uncooperating witness's incarceration for civil contempt to eighteen (18) months. (ECF No. 111). This Court denied his motion, and the Sixth Circuit affirmed, reasoning that "Thompson's contempt was not predicated only on his failure to testify or answer questions; rather, because Thompson also failed to fulfill the non-testimonial requirements of his plea agreement." *United States v. Thompson*, 925 F.3d 292, 301 (6th Cir. 2019). As such, the Recalcitrant Witness Statute "[did] not limit the length of Thompson's incarceration" which is "restricted only by the Due Process Clause and, if applicable, any changed circumstances which prohibit Thompson from curing his contempt." *Id*. at 203.

Thompson has since filed multiple motions trying to secure his release. (*See* ECF Nos. 111, 181, 202, 203, 213). So far, none has succeeded. In September 2022, this Court denied Thompson's motion to dismiss the civil contempt charges on account of state jury verdicts that were entered in December 2018 against him and in favor of some Civil Litigants (The Dispatch, Columbus Exploration, LLC, and Recovery Limited Partnership). (ECF No. 240). Thompson's motion for compassionate release, based on the COVID-19 pandemic, was likewise denied. (*Id*.).

After this Court directed the parties to discuss "whether the incarceration has lost its coercive effect, whether alternative sanctions would be more or equally effective, and at what point

continued incarceration would offend the Due Process Clause," (ECF No. 240), Thompson filed several motions now pending before this Court.

In December 2022, Thompson filed a *pro se* motion to rescind the contempt order (ECF No. 257), arguing that his continued detention violates his due process rights and that his age and alleged health conditions put him at greater risk of COVID-19, which the Government opposed. (ECF Nos. 257, 262). Following a hearing in April 2023, defense counsel amended Thompson's *pro se* motion, expanding on Mr. Thompson's argument that his civil contempt incarceration violates due process and has lost its coercive effect ("Amended Motion"). (ECF No. 283). In response, the Government opposed any finding of a due-process violation but agreed that this Court should exercise its discretion to lift Mr. Thompson's contempt sanction and impose the criminal judgment. (ECF No. 284). Trustee John Pidcock joined the Government's response, "agree[ing] that the time has come to end the incarceration component of the civil contempt sanction and impose the criminal judgment," and expressing "no objection to the course proposed by Defendant Thompson's Amended Motion to Rescind Contempt Order." (ECF No. 290). Interested Party The Dispatch opposed the Amended Motion, arguing that granting the motion "would only serve to reward [Mr. Thompson] for his disrespect of this Court and disregard of this Court's Orders," whereas "denying Thompson's motion would increase the substantial coercive effect of his continued incarceration by sending a clear message that he cannot expect to be released from confinement until he purges his contempt by providing assistance in locating and recovering the 500 gold coins and other missing assets." (ECF No. 285).

In November 2023, defense counsel filed a motion seeking an order allowing Mr. Thompson to have updated medical tests conducted. (ECF No. 293). In May 2024, defense counsel moved this Court for a decision upon the pending Amended Motion, or in the alternative, an

expedited status hearing. (ECF No. 294). In that motion, Defense counsel explained that, since the April 2023 hearing, Mr. Thompson "continues to be deprived of adequate medical diagnosis and/or treatment from the Milan facility medical staff relative to his varied conditions." (*Id.* at 5). Additionally, the motion noted that Interested Parties—The Dispatch Printing Company and Trustee Pidcock—"have been utilizing other remedies available to them to satisfy their civil judgments . . . ." (*Id.*). For example, "[o]n January 9, 2023, Trustee Pidcock was granted an order to examine 75 boxes of records seized from Defendant for purposes of 'locating assets that can be liquidated and distributed to the investors . . . .'" (*Id.* (quoting ECF No. 264)). In addition, "Trustee Pidcock retained a collection firm to execute upon its judgment against Defendant," and "[o]n December 15, 2023 the Dispatch Printing Company utilized the Franklin County Common Pleas Court to schedule a virtual Judgment Debtor Examination." (*Id.* at 6). According to defense counsel, Mr. Thompson refused to submit to the examination and be interrogated, however, and the court declined to take any further action as a consequence; thus, "the matter went no further." (*Id.*).

On December 11, 2024, defense counsel filed the Supplemental Motion (ECF No. 308), raising "the 72-year-old Defendant's multitude of medical and psychological conditions" that "continue to deteriorate at a rapidly increasing pace." (ECF No. 308). Specifically, defense counsel explained that Mr. Thompson (1) experiences worsening physical and mental ailments associated with SEID; (2) suffers from a cardiac condition that led to him being rushed to the emergency room in October 2024; and (3) has not received adequate medical attention at the Milan facility, as the medical staff has "arbitrarily changed" his medications, "taken his wheelchair away," "moved him into a double cell with other prisoners who have mental issues and beaten him up

resulting in a broken finger," "moved him to the Special Housing Unit (SHU)," and "deprived him access to his legal files." (*Id.*).

The Government, in response, agrees that this Court should end Mr. Thompson's confinement on his civil contempt charges, given that he was recently "taken to the emergency room due to a cardiac incident"; that "[h]e is now 72 years old"; and that his "age and physical condition provide further reasons for the Court to exercise its discretion to end his detention for civil contempt." (ECF No. 310). The Government also argues that ending Mr. Thompson's detention for civil contempt—and subsequently entering the criminal judgment—advances "[t]he parties, the public, and the Court['s] . . . interest in the finality of that matter." (*Id.*). The Dispatch, for its part, expressed that it "does not object if this Court decides to exercise its discretion to release Defendant Thompson," requesting only that "if the Court chooses to release Defendant Thompson, the ongoing daily fine of . . . $1,000.00[] per day be reduced to a money judgment in favor of TDPC and the Liquidating Trustee." (ECF No. 314 at 1). Mr. Pidcock expressed no position on Thompson's incarceration but likewise maintained that "Defendant Thompson's civil contempt sanction should not end or be finalized without addressing the accrued daily fines of $1,000 per day that Defendant Thompson has accrued since 2015." (ECF No. 315 at 1).

### 4. *Interested Parties' Motion for Entry of Interim Judgment*

As several of Thompson's above-referenced motions were pending, Interested Parties—The Dispatch and Trustee Pidcock—filed a joint motion in August 2024, asking this Court to convert Thompson's accrued contempt fines as of August 6, 2024, to a federal money judgment in the amount of $3,156,000 in their favor. (ECF No. 208). Recognizing that "the state court Judgments . . . included the value of the Gold Coins as of December 18, 2018," Interested Parties nonetheless argue that they are entitled to "the increase in the value of the Gold Coins between the

2018 state court Judgments and the present." (ECF No. 298 at 4). Additionally, they contend that a federal judgment in addition to the state court judgments "would give the Civil Litigants different collection powers and improve their opportunity to actually collect from Mr. Thompson." (*Id.* at 2). Their Joint Motion also proposes an apportionment structure between Interested Parties and the Government, "without prejudice to the [Interested Parties'] ability to request additional amounts to be added to a further interim or final judgment for the civil contempt fines." (*Id.* at 2).

Thompson opposed the Joint Motion, charging Civil Litigants with attempting to manipulate the proceedings before this Court to satisfy their state court judgments; to have this Court recreate a debtor's prison; and to use this Court "as a collection agent." (*See* ECF No. 304 at 7–8). According to Thompson, the issues raised in the Joint Motion "should be addressed at the time the contempt order is vacated and the ongoing daily fines are finalized and reduced to a fixed amount." (*Id.* at 9).

The parties' pending motions (ECF Nos. 257, 283, 308, 293, 294, 295, 298) have been fully briefed and are now ripe for resolution.

## II.     STANDARD OF REVIEW

This Court's decision concerning whether to hold a party in contempt is within its sound discretion. *Gascho v. Global Fitness Holdings, LLC*, 875 F.3d 797, 800 (6th Cir. 2017). Civil contempt is used to coerce a party to do what the court has previously ordered him to do or to "compensate the complainant for losses sustained." *Elec. Workers Pension Tr. Fund of Loc. Union |58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 379 (6th Cir. 2003). A civil contemnor carries the keys to the prison in their own pocket and can end his or her sentence at any moment by complying with the court order. *Hopper v. Plummer*, 887 F.3d 744, 753 (6th Cir. 2018) (quoting

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911)). In other words, "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *Int'l Union v. Bagwell*, 512 U.S. 821, 827 (1994). This differentiates civil contempt from criminal contempt, the purpose of which "is punitive, to vindicate the authority of the court." *Id.* at 827–28.

## III.    LAW AND ANALYSIS

Courts have the power "to enforce compliance with their lawful orders through civil contempt." *Spallone v. United States*, 493 U.S. 265, 276 (1990) (quoting *Shillitani v. United States*, 384 U.S. 364, 370 (1966)). A civil contemnor carries the keys to the prison in his or her own pocket and can end his or her sentence at any moment by complying with the court order. *Hopper v. Plummer*, 887 F.3d 744, 753 (6th Cir. 2018) (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 442 (1911)). In other words, "civil contempt sanctions, or those penalties designed to compel future compliance with a court order, are considered to be coercive and avoidable through obedience." *Int'l Union v. Bagwell*, 512 U.S. 821, 827 (1994). Once a civil contempt sanction has lost its coercive effect, however, it becomes violative of the contemnor's Due Process rights to continue his confinement. *In re Grand Jury Proceedings*, 877 F.2d 849, 850 (11th Cir. 1989) ("*Howald*"); *In re Grand Jury Investigation*, 600 F.2d 420, 423–24 (3d Cir. 1979) ("*Braun*"); *Catena v. Seidl*, 321 A.2d 225, 228 (N.J. 1974).  Indeed, the Sixth Circuit recognized that "the length [of] Thompson's incarceration is restricted only by the Due Process Clause and, if applicable, any changed circumstances which prohibit Thompson from curing his contempt." *Thompson*, 925 F.3d at 303.

14

**A. Thompson's Health Concerns**

While Mr. Thompson's prior motions for relief argue that his civil contempt sanctions have lost their coercive effect, his latest filing focuses on his health issues. Specifically, Thompson claims to have a "multitude of medical and psychological conditions [that] continue to deteriorate at a rapidly increasing pace." (ECF No. 312 at 4). These include "Myalgic Encephalomyelitis (ME) which is associated with Chronic Fatigue Syndrome and is now known as Systemic Exertion Intolerance Disease (SEID)," that causes him to experience "severe fatigue, cognitive dysfunction and post-exertional malaise." (*Id*.). Independent of SEID, Thompson also claims to suffer from a number of heart conditions: atrial fibrillation disorder, renal artery stenosis, stroke, lumbosacral joint degradation, hypertension, and mixed hyperlipidemia. (*Id*. at 4–5). He was rushed to the emergency room on October 11, 2024, for an incident of atrial fibrillation disorder and further explains that "[t]he follow up treatment by the medical staff at Milan has been spotty" and is "complicated by the frequent turnover in medical staff . . . as well the staff's desire to avoid any civil liability by not assuming the risk of treating the Defendant any more than the absolute bare minimum." (*Id*.). As a result, "[h]is medications have been arbitrarily changed and he has not received much needed diagnostic testing." (*Id*.).

This Court has previously addressed the bulk of Mr. Thompson's health concerns when ruling on his motions for release and medical testing. (*See* ECF Nos. 88, 148, 160, 194, 200, 232). Recognizing Thompson's unique detained status—as a civil contemnor who has pled guilty to criminal contempt charges—this Court analyzed his medical needs under varying frameworks that apply to convicted prisoners as well as to pretrial detainees. (*See* ECF No. 194 at 4 ("Thompson will be entitled to at least all of the rights of a convicted prisoner, in addition to those rights

guaranteed to individuals who have not yet been convicted of a crime.").[4] The Sixth Circuit, however, has since made clear that Thompson's civil contempt incarceration is restricted "only by the Due Process Clause" and "any changed circumstances which prohibit Thompson from curing his contempt." *Thompson*, 925 F.3d at 303.

Consistent with that directive, and absent any authority suggesting that due process entitles Thompson to compassionate release, this Court need not address whether Mr. Thompson's medical ailments are the kind of "extraordinary or compelling reasons" that justify release under 18 U.S.C. § 3582(c). Rather, this Court focuses on the due process clause of the Fourteenth Amendment, which "requires government officials to provide adequate medical care to pretrial detainees and others in their custody who are not serving a sentence." *Heeter v. Bowers*, 99 F.4th 900, 915 (6th Cir. 2024); *see Lawler as next friend of Lawler v. Hardeman Cnty., Tennessee*, 93 F.4th 919, 926 (6th Cir. 2024) (claims that a prison doctor "fail[ed] to treat the detainee for a harmful medical condition" implicates the "legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm"). In addition to analyzing Thompson's claims of inadequate medical treatment under the Due Process Clause, this Court also considers

---

[4] For example, when presented with Mr. Thompson's motion for release due to the COVID-19 pandemic, this Court analogized Mr. Thompson's civil contempt to a pretrial detainee and denied relief based on the factors identified in the Bail Reform Act, 18 U.S.C. § 3142(g), because he posed a flight risk and had not introduced sufficient evidence of his medical risk. (ECF No. 194 at 5–8). When ruling on his self-captioned "Motion for Compassionate Release," this Court "assume[d] for immediate purposes . . . that compassionate release is applicable to his civil contempt incarceration" but found no "extraordinary or compelling reasons" to warrant a sentence reduction pursuant to 18 U.S.C. § 3582(c). (ECF No. 240). Thompson's "Motion for Adequate Medical Care" was likewise construed as prisoner's "motion for transfer grounded in the Eighth Amendment's prohibition on cruel and unusual punishment." (ECF No. 148). A hearing was subsequently held on Mr. Thompson's claims that his "medical sensitivities have been aggravated by the conditions at FCI Milan." (*See* ECF No. 148). And, rejecting those claims, this Court found "no evidentiary basis upon which . . . to support a finding that Mr. Thompson is being held in cruel and unusual conditions in violation of his Eighth Amendment rights." (*Id.*).

whether Thompson's alleged health issues constitute "changed circumstances which prohibit Thompson from curing his contempt." *Thompson*, 925 F.3d at 303.

### 1. Whether FCI Milan Staff's Response to Thompson's Medical Needs Violated his Due Process Rights

To establish a due process claim based on inadequate medical treatment, Thompson must show that (1) he had an objectively "serious medical need"; and (2) FCI Milan officials "recklessly disregarded []an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Heeter*, 99 F.4th 900 at 915–16 (internal quotation marks and citation omitted). The first prong requires showing a medical need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Griffith v. Franklin Cnty.*, 975 F.3d 554, 567 (6th Cir. 2020) (internal quotation marks omitted). For the second component, Thompson must show "that the officer either *knew* the risk of harm and disregarded it, or that they '*recklessly disregarded* a risk so obvious that they ... should have known of it.'" *Heeter*, 99 F.4th at 916 (quoting *Lawler*, 93 F.4th at 927). Thompson "must also prove that the officer ' "responded" to the risk in an unreasonable way.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)).

Assuming that Thompson can show a sufficiently serious medical need, he has presented no evidence regarding information known to—or so obvious but ignored by—FCI Milan staff as to demonstrate reckless indifference to such a need. For one, he acknowledges that he was rushed to the emergency room following an incident of his atrial fibrillation disorder. While his follow up at the facility may have been "spotty," such allegations do not amount to a constitutional violation. *See Westlake v. Lucas*, 537 F.2d 857, 860, n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound

17

in state tort law.") (citations omitted)). His claims that "[h]is medications have been arbitrarily changed and he has not received much needed diagnostic testing," and that his "previously diagnosed conditions . . . are not being treated timely or properly" are likewise unsupported by any evidence that FCI Milan's conduct fails to meet appropriate professional standards. As to his other grievances—that staff had "moved him into a double cell with other prisoners who have mental issues and beaten him up resulting in a broken finger," "moved him to the Special Housing Unit (SHU)," and "deprived him access to his legal file"—he fails to establish that these conditions were imposed arbitrarily. *See Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (the fact that detainee in county jail temporarily had to sleep upon a mattress on the floor or on a table because of overcrowding at jail did not amount to a constitutional deprivation, where there was no evidence that such conditions were imposed arbitrarily).

Finally, that administrators and staff had taken his wheelchair away and "repeatedly expressed to him their desire that he be gone from the facility" is admittedly unkind and harsh, but it too does not amount to a constitutional violation. *See Cleveland v. Los Angeles Cnty. Sheriffs Dep't*, No. 215CV01399DSFGJS, 2017 WL 1364227, at *9 (C.D. Cal. Feb. 7, 2017) ("The only act at issue here against [officer]—that he physically dumped Plaintiff out of wheelchair and forced him to crawl into his cell—may have been unkind or harsh, but is not sufficient to establish a constitutional violation. 'Not every malevolent touch by a prison guard gives rise to a federal cause of action.'" (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010))), *report and recommendation adopted sub nom. Cleveland v. Los Angeles Cnty. Sheriff's Dep't*, No. 215CV01399DSFGJS, 2017 WL 1386003 (C.D. Cal. Apr. 11, 2017).

In sum, despite Thompson's long litany of complaints, he fails to establish a due process violation based on inadequate medical treatment at FCI Milan that would justify terminating his

civil contempt incarceration. Thompson's motions to rescind the contempt order on this basis are therefore denied.

### 2. Whether Thompson's Health Conditions Present "Changed Circumstances" that Prohibit him from Curing his Contempt

Nor do Thompson's health concerns present "changed circumstances which prohibit [him] from curing his contempt." *See Thompson*, 925 F.3d at 303. As a reminder, this Court held a competency hearing in September 2016 and, based on two independent psychiatric evaluations, found that Mr. Thompson "suffers from no neurological condition that would interfere with his ability to comply with the terms of his plea agreement . . . ." (ECF No. 88). Mr. Thompson was also permitted to conduct additional rounds of testing to assess his claimed ailment of "systemic exertion intolerance disease." (*See* ECF Nos. 160, 232). Yet, to date, Thompson has been unable to substantiate his claims that a diagnosis of SEID would result in a failure of memory such that he could not comply with his plea agreement and cooperate in a deposition. Medical experts who have examined Thompson's claims of memory deficit over the years have found his memory to be intact, even impressive at times. (*See* ECF No. 88; ECF No. 115, Tr. 17:2-17). It is indeed peculiar: Thompson can remember everything that would help him mount a defense for why he should not comply, but he cannot remember the whereabouts of what is arguably the centerpiece of his life's work—these commemorative gold coins. (*See id.*).

The parties, to be sure, agree that Mr. Thompson's age and conditions warrant release. (*See* ECF No. 309 at 2 ("Mr. Thompson's age and physical condition provide further reasons for the Court to exercise its discretion to end his detention for civil contempt."); ECF No. 314 at 1 ("TDPC also understands that ten years of detention is a long time, especially for a 72-year-old man who apparently suffers from multiple physical and mental health issues.")).

Absent any evidence that his age and health prohibit him from complying with the contempt order, however, those reasons do not warrant lifting the contempt sanctions. Accordingly, this Court denies Thompson's request to lift his civil contempt sanctions on the basis of his age and health concerns.

### B. The Coercive Effect of Thompson's Civil Contempt

Thompson's second basis for requesting release is that his civil contempt sanctions have lost their coercive effect. One way that a contemnor may show that a civil contempt sentence lacks or has lost its coercive effect is to demonstrate that he or she is unable to comply with the court's order. *United States v. Rylander*, 460 U.S. 752, 757 (1983).

In his Amended Motion, Thompson emphasizes that he has "refused to comply at every possible opportunity" provided to him since December 2015 to cure his contempt. (ECF No. 283 at 12). As such, "there is no realistic possibility that Thompson can or will comply[.]" (*Id*. at 4–5). The Government responds that, although Thompson's continued incarceration would not violate the Due Process Clause, "the time has nonetheless come to end the civil contempt sanction and impose the criminal judgement[.]" (ECF No. 284). According to the Government, Thompson has not demonstrated his *inability* to comply but merely his steadfast *unwillingness* to do so. It is this unwillingness, the Government argues, that has persisted since December 15, 2015. The Government contends that considerable resources have been expended on Thompson's civil contempt proceedings, and the lifting of Thompson's civil contempt sanctions would allow for the resolution of the related criminal matter and thus provide finality to the parties, the public, and this Court. (*See* ECF No. 309 at 2).

Mr. Pidcock, like the Government, argues that Thompson's civil contempt sanctions should be lifted and that Thompson should be permitted to begin his criminal sentence. The Dispatch, on

the other hand, insists that Thompson's civil contempt sanctions have not yet lost their coercive effect, and that release from incarceration would reward him for disobeying this Court. (ECF No. 285). Should the sanctions be lifted, both Mr. Pidcock and the Dispatch ask this Court to provide the civil litigants and other interested parties with an opportunity to argue that Thompson's accrued civil contempt fees should be distributed to them as compensation for losses caused by his contempt. (ECF No. 290 at 2 (quoting ECF No. 63)). Specifically, the Dispatch proposes that Thompson should be required to: (1) "pay his civil contempt fine or at the very least post a bond or other security in the amount of his unpaid civil contempt fine"; and (2) pay an additional $2,000,000.00 fine "for the damages caused by his multiple years of defying the Court's Orders." (ECF No. 285 at 9).

In addition to the above briefing, two law professors specializing in bankruptcy and debt collection, Christopher D. Hampson and Lea Kmvinskas Shepard, sought leave to participate as amicus curiae in support of Thompson's Amended Motion. (ECF No. 295). Because this Court resolves the matter without reference to the brief, their request is denied as moot and without prejudice.[5]

### 1. Civil Contempt Incarceration

This Court has previously acknowledged that Thompson has the ability to comply with the Court's orders but refuses to do so. *See e.g.*, *Thompson,* 2022 WL 4182364, at *2. Even now, Thompson does not argue that he *cannot* cure his contempt; he argues instead that his unwavering *refusal* to comply compels his release. (ECF No. 257 at 2). After all, "[w]hen it becomes obvious that sanctions for contempt are not going to compel compliance, they lose their remedial

---

[5] This Court nevertheless appreciates the work of proposed amici.

characteristics, and take on more of a punitive nature." Wright & Miller, 3A Fed. Prac. & Proc. Crim. § 703 (4th ed.).

Indeed, indefinite incarceration turns a civil contempt sanction into a criminal penalty when it becomes apparent that the contemnor will never comply with the court order. *See Catena*, 321 A.2d at 228 ("Most commentators agree that in civil contempt proceedings involving an adamant contemnor, continued imprisonment may reach a point where it becomes more punitive than coercive and thereby defeats the purpose of the commitment."); *see also Braun*, 600 F.2d at 423–24; *Lambert v. Montana*, 545 F.2d 87, 90 (9th Cir. 1976); *Soobzokov v. CBS, Inc.*, 642 F.2d 28, 31 (2d Cir. 1981); *Howald*, 877 F.2d at 850; *United States ex rel. Thom v. Jenkins*, 760 F.2d 736, 740 (7th Cir. 1985).

But for civil contempt sanctions to become punitive, the court must conclude, often after first incarcerating or otherwise penalizing the contemnor, that the contemnor is unlikely ever to comply. This inquiry effectively becomes a test in which the court must predict whether the contemnor's resolve will withstand the anticipated coercive power of potentially indefinite civil sanctions. But once the court is convinced that the contemnor will never comply, it is required to release him or her from confinement. In practice, this test leaves district judges with the "perplexing task" of determining either that the contemnor will truly never comply or that more incarceration may convince the contemnor to comply. *In re Grand Jury Proceedings*, 994 F.Supp.2d 510, 514 (S.D.N.Y. Jan. 28, 2014) ("*Koch*"). Not even a contemnor's avowed intention or sworn belief that he or she will never comply is conclusive. *Simkin v. United States*, 715 F.2d 34, 37 (2d Cir. 1983); *Matter of Parish*, 782 F.2d 325, 327–28 (2d Cir.1986). Nonetheless, it is the contemnor who ultimately shoulders the burden of proving to the court that no such realistic possibility exists of the contemnor ever complying. *Simkin*, 715 F.2d at 37.

This test is not without its detractors. For example, the district court in *Matter of Parrish* argued that this system unwisely and automatically compels a court to discharge a contemnor from custody if it determines that there is no reasonable probability that the contemnor will ultimately comply. *Matter of Parish*, 613 F. Supp. 356, 357 (S.D.N.Y. 1985), *aff'd sub nom. Matter of Parrish*, 782 F.2d 325 (2d Cir. 1986). But "[i]f utter contempt for the law is a defense against incarceration," the district court argued, a better approach would be to hold a hearing on the likelihood of compliance on the first day of a contemnor's contempt rather than incarcerating a contemnor first to test his or her resolve. *Id.*

In *Koch*, Judge Keenan objected that this option for release from a civil contempt sentence effectively allows a contemnor to escape incarceration if he or she can prove his or her resolve for long enough. 994 F.Supp.2d at 516. First, it would prevent those with strong rationales for their ideological crimes from being held for civil contempt because these contemnors will never reveal the requested information and will therefore receive leniency. *Id.* (citation omitted). Second, the rule grants discretion to judges such that a judge's biases may convince him or her to grant or deny release when the opposite course may be proper. *Id.* (citation omitted). Dissenters also argue that the test could cause those who refuse to be compelled to testify to spend less time incarcerated than those who eventually will testify. *See In re Crededio*, 759 F.2d at 593, 589 (Posner, J., dissenting) ("[I]f a man is ordered to do something and is held in contempt in a prison until he does it, he can free himself by becoming more determined not to do it."). Despite these arguments, however, "[w]hether the contemnor's failure to comply with the court's order is attributable to inability or resolute unwillingness, there is a limit to how long he or she can be incarcerated when such a sanction has no coercive power." *Armstrong v. Guccione*, 470 F.3d 89, 115 (2nd Cir. 2006) (Sotomayor, J., concurring).

In *Armstrong*, the Second Circuit affirmed a district court's refusal to lift a contemnor's civil contempt sanctions although he had been incarcerated for nearly seven years. 470 F.3d at 113. The district court determined that the contemnor, Martin Armstrong, had steadfastly refused to relinquish approximately $15 million in corporate assets to a court-appointed receiver because he aspired eventually to retain the assets for himself. *Id.* at 112. According to the Second Circuit, this reasoning was sufficient for the district court to conclude that Armstrong may comply upon the realization that he would never reassume control of the assets. *Id.* at 113.

In *Koch*, one of the few cases in which the test was used to release a contemnor, the court took notice of contemnor Gerald Koch's political admirers and their support for him to remain silent in an alleged political crusade against him and his friends. 994 F.Supp.2d at 517. The court reasoned that continuing to leave Koch incarcerated would only make him more of a martyr to his supporters and would further drive his self-interests. *Id.* Koch was subsequently released from confinement.

This Court is satisfied that this test's application ensures the due process rights of civil contemnors. *See Thompson*, 2022 WL 4182364, at *5 (recognizing that, given "the strong liberty interests at stake," the appropriateness of Mr. Thompson's continued incarceration depends upon whether the sanction "remains calculated to procure compliance with the plea agreement."). If a court truly believes that the contemnor will never comply with the court's orders, then it is the responsibility of the court to release the contemnor from imprisonment and seek other methods of enforcement that are consistent with due process.

Thompson has been incarcerated in federal prison for almost a decade for civil contempt and is yet to begin serving his criminal contempt term of two years. While the length of incarceration is not dispositive of the issue before this Court, it demonstrates Thompson's intent

24

not to comply with this Court's Order with every growing day. This Court has found in the past through countless hearings that Thompson *can* comply by revealing the location of the gold coins but has *refused* to do so. Despite the passage of time and Thompson's repeated assertions that his health is in decline, Thompson has refused to cure his contempt. This Court has expended significant resources throughout the years to obtain Thompson's compliance. For a decade, Thompson's answer at every turn has been "no." While the Court is not persuaded that Thompson is *unable* to comply with the order, it no longer is convinced that further incarceration is likely to coerce compliance.

This Court therefore **GRANTS** Thompson's Amended and Supplemental Motions (ECF No. 283), thereby lifting his civil contempt sanctions. Because this Court tolled Thompson's two-year criminal sentence during his incarceration for civil contempt, however, Thompson will remain in the custody of the Federal Bureau of Prisons until he completes the criminal sentence. (*See* ECF No. 63 at 6).

### 2. Civil Contempt Fines

As previewed above, Thompson's civil contempt sentence had two components: (1) incarceration; and (2) a fine of $1,000 per day, payable to the Clerk of Court, until Thompson has purged the contempt. As of today, Thompson's contempt period spans a total of 3,335 days (from December 15, 2015,[6] to January 31, 2025). This Court therefore assesses Thompson's total civil contempt fine in the fixed sum of $3,335,000.00, due upon Thompson's release from incarceration following the completion of his two-year criminal contempt sentence.

---

[6] Although the Order imposing the civil contempt sentence is dated December 16, 2015, it merely memorialized this Court's oral ruling made the day before. (*See* ECF No. 67 at 75:6–75:11).

One last item remains: the request by Interested Parties to "convert Thompson's accrued contempt fines . . . to a money judgment in favor of the Civil Litigants and U.S." (ECF No. 298). As the Contempt Order explained, there are two types of fines for civil contempt: the first is payable to a complainant while the second is payable to the Court. (ECF No. 63 at 5 (citing *United States v. Bayshore Assocs.*, 934 F.2d 1391,1400 (6th Cir. 1991)). Because "the Civil Litigants ha[d] not requested that the Court impose a fine or presented evidence of their losses," "only the second kind of fine [was] . . . an option before the Court." (*Id.*). Nonetheless, the Contempt Order kept the door to the first type open, providing that "[a]fter Thompson purges himself of the contempt, Civil Litigants will be given an opportunity to present evidence of their actual losses as a result of Thompson's civil contempt, and the Court may choose to transfer the fines to the Civil Litigants." (*Id.* at 5–6). Accordingly, upon Thompson's completion of his two-year criminal contempt sentence, this Court will establish a schedule of payments for the fine and, as stated in its Order (ECF No. 63), schedule a hearing to determine whether to convert Thompson's fine into a money judgment.

The Joint Motion for Interim Judgment (ECF No. 298) is therefore **DENIED** at this time. Civil Litigants may renew these arguments, as appropriate, after Thompson completes his two-year criminal sentence.

## IV.    CONCLUSION

For the reasons stated above, this Court **GRANTS IN PART** Thompson's Amended and Supplemental Motions to Rescind Contempt Order (ECF Nos. 283, 308) and **TERMINATES** Thompson's incarceration for civil contempt (ECF No. 63). Thompson's civil contempt fine is hereby **FIXED** in the sum of **$3,335,000.00**, due after Thompson's completion of his two-year criminal sentence and pursuant to a payment schedule to be established by this Court.

Thompson's criminal sentence is hereby **REINSTATED**; the Clerk of the Court is **DIRECTED** to enter Thompson's criminal Judgment in accordance herewith. Thompson **shall** remain incarcerated and begin his two-year criminal contempt sentence immediately.

Interested Parties' Joint Motion for Entry of Interim Judgment (ECF No. 298) is **DENIED WITHOUT PREJUDICE.**

Thompson's Pro Se Motion to Rescind Contempt Order (ECF No. 257); Motion for Updated Medical Tests (ECF No. 293); Motion to Render Decision on Amended Motion or to Schedule an Expedited Hearing (ECF No. 294); and Proposed Amici's Motion for Leave (ECF No. 295) are **DENIED AS MOOT.**

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: January 31, 2025**